**OHIO MANUFACTURERS' ASSOCIATION; Akron Selle Company, Plaintiffs-Appellants,**

v.

**CITY OF AKRON, State of Ohio; Health Commission, City of Akron; Health Department, City of Akron; C. William Keck, as Director of Health of the City of Akron; Harold K. Stubbs, as Director of Law of the City of Akron, Defendants-Appellees.**

No. 86–3191.

United States Court of Appeals, Sixth Circuit.

Argued June 10, 1986.

Decided Sept. 17, 1986.

Rehearing and Rehearing En Banc Denied Oct. 31, 1986.

Duke W. Thomas, C. William O'Neill (argued), John W. Hoberg, Marcia J. Mengel, Columbus, Ohio, for plaintiffs-appellants.

Secretary of Labor Nathaniel I. Spiller, Mary-Helen Mautner, U.S. Dept. of Labor, Washington, D.C., for amicus curiae plaintiffs-appellants.

Janice E. Crossland (argued), Asst. Dir. of Law, Akron, Ohio, for defendants-appellees.

Paul J. Malesick, Salvatore J. Falletta, Akron, Ohio, for amicus curiae defendants-appellees.

Before MARTIN and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

RALPH B. GUY, JR., Circuit Judge.

Plaintiffs appeal the district court's judgment 628 F.Supp. 623 in favor of defendants entered after the court determined that the Akron "Right to Know" Ordinance, regulating hazardous and toxic substances in the workplace, was not preempted by the Occupational Safety and Health Act (OSH Act) of 1970, 29 U.S.C. § 651, *et seq.*, or the Occupational Safety and Health Agency's (OSHA) Hazard Communication Standard, 29 C.F.R. § 1910.

Plaintiffs are the Ohio Manufacturers' Association, a non-profit membership association representing 61 employers in the City of Akron, classified within Standard Industrial Classification (SIC) Codes 20 through 39, and Akron Selle Company, an Akron contract metal stamping company employing 20 persons and classified within SIC Code 34.[1] Defendants are the City of Akron; Akron's Health Commission; Akron's Health Department; C. William Keck, M.D., Director of Health; and Harold K. Stubbs, Director of Law. The latter four defendants share responsibility for the enforcement of the ordinance. Plaintiffs brought suit, claiming that the Akron ordinance is preempted by federal law.[2] Although we reject many of plaintiffs' contentions, as did the trial court, we nonetheless find preemption and reverse.

**I.**

**A. *The Akron Right to Know Ordinance***

Akron's Right to Know Ordinance, enacted in December of 1984, regulates the presence of hazardous and toxic substances in the workplace. The purposes of the ordinance are twofold: to protect workers by requiring employers to provide information to their employees and designated representatives about hazardous chemicals to which the employees may be exposed; and to protect public health officials, and the public in general, by requiring employers to provide information to the City's Fire Division and Health Department about the hazardous chemicals manufactured, used, or stored inside the workplace and the hazardous chemicals discharged from the workplace or stored as chemical waste.

The Akron Health Commission is charged with administration and enforcement of the ordinance. The commission is first directed to compile a master list of hazardous chemicals including all of the chemicals listed in (1) OSHA's list of Toxic or Hazardous Substances, at 29 C.F.R. § 1910, Subpart Z; (2) the United States Department of Transportation's Hazardous Materials Table, 49 C.F.R. § 172.101; (3) the American Conference of Governmental and Industrial Hygienists' list entitled "Threshold Limit Value for Chemical Substances and Physical Agents in the Workplace;" (4) the International Agency for Research on Cancer's sublist entitled "Substances found to have at least sufficient evidence of carcinogenicity in animals;" and (5) the National Toxicology Program's

---

1. SIC Codes 20 through 39 consist primarily of categories of manufacturers as set forth in the Standard Industrial Classification Manual published by the United States Office of Management and Budget.

2. In the district court and on appeal, *amici curiae* briefs were submitted by several Akron community groups, including the Rubber Manufacturers' Association; the Chemical Manufacturers' Association; the National Paint and Coatings Association Inc.; the Society of the Plastics Industry, Inc.; Flexible Packaging Association and the National Screw Machine Products Asso-

ciation (jointly); and by the Akron Catholic Commission; The Akron-Medina County Labor Council, AFL–CIO); Akron-Summit Community Action Agency; Council of Black Club Presidents; International Chemical Workers Union, AFL–CIO; the Ohio Public Interest Campaign; the Opportunity Parish Ecumenical Neighborhood Ministry; the United Rubber, Cork, Linoleum & Plastic Workers of America and the United Rubber Workers, Local 2 Retirees (jointly). On appeal the Secretary of Labor was permitted to file an *amicus curiae* brief.

list of chemicals published in the annual report on carcinogens.

Under the ordinance, employers are required to post signs notifying employees that they have a right to information from their employers regarding the toxic or hazardous effects of the chemicals and the circumstances under which these effects may be produced. Employers are also required to ensure that each container of hazardous chemicals in the workplace is labeled, tagged, or marked: (1) with the chemical name, if not a trade secret; (2) with the Department of Transportation's required labels for substances it regulates; (3) with a cancer warning for all materials that pose a cancer hazard; and (4) with warnings for all materials which pose a reproductive hazard.

The ordinance also imposes employer filing and reporting requirements. Each January, employers are ordered to file with the Health Department a list of all work areas where hazardous chemicals are manufactured, used, or stored, specifying by chemical name all such chemicals in each work area. Furthermore, employers must immediately report to the Health Department information concerning any spill, leak, discharge, or emission of any hazardous substance which is required to be reported to or filed with any federal or state agency under applicable law.

Employers are required to obtain or develop a material safety data sheet (MSDS) for each hazardous chemical which they manufacture, use, or store. Each MSDS must contain, among other things, the following information: (1) the identity used on the label and, except as necessary to protect trade secrets, whether the chemical is a single substance or a mixture which has been tested as a whole to determine its hazards, its chemical and common names; or, if the hazardous chemical is a mixture, the chemical and common names of all ingredients; and the chemical and common names of all ingredients set forth on the master list which have been determined to be physical hazards; (2) the physical and chemical characteristics of the hazardous

chemical, including its potential for fire, explosion, and reactivity; (3) the known acute and chronic health effects of exposure to the hazardous chemical; (4) the primary route of entry and permissible exposure limit for hazardous chemicals; (5) any precautions for safe handling and use which are known to the employer or preparer; (6) any control measures which are known to the employer or preparer; and (7) emergency and first aid procedure. A MSDS is required to be updated within 90 days of the employer obtaining new and significant information regarding the health hazard of a chemical. Employees are entitled to be given a copy of a MSDS upon request.

The ordinance requires that employers maintain an employee training and education program designed to provide employees who may be exposed to hazardous substances or mixtures the information necessary to understand their hazards. Training must also include the hazard communication methods used by the employer, appropriate work practices, protective measures, emergency procedures, and the methods employees may use to receive information under the ordinance.

In addition to enforcing the ordinance, the commission is charged with the obligation of forwarding all information to the Fire Department pertinent to the performance of its duties. A provision also speaks to the protection of trade secrets.

The final substantive provision enumerates employee rights under the ordinance, including the employee's right to receive requested information, protection from discharge for filing a complaint, requests for inspection by the Health Commission, and the right to maintain a private cause of action for violations of the ordinance.

B. *The OSH Act and The Hazard Communication Standard*

Section 6 of the OSH Act directs the Secretary of Labor to promulgate occupational safety and health standards to further the purpose of the Act "to assure so far as possible every working man and

woman in the Nation safe and healthful working conditions...." 29 U.S.C. § 651(b). To that end, the Secretary of Labor has established the Hazard Communication Standard, pursuant to 29 U.S.C. § 655(b)(7), and set forth at 29 C.F.R. § 1910. The relevant history of the promulgation of this standard began in 1974, when the National Institute for Occupational Safety and Health, an agency created by section 22 of the OSH Act, 29 U.S.C. § 671, recommended that the Secretary promulgate a standard requiring employers to inform employees of potentially hazardous materials in the workplace. 47 Fed.Reg. 12095 (1982). Later that year the Secretary appointed an advisory committee to develop standards for implementation of the statutory provision requiring labels or other appropriate forms of warning. That advisory committee issued its report on June 6, 1975, recommending a classification of hazards, the use of warning devices such as labels and placards, disclosure of chemical data, and employee training programs. *Id.* at 12096.

On January 16, 1981, OSHA published a notice of proposed rulemaking entitled "Hazards Identification." 46 Fed.Reg. 4412–53. This initial proposal was withdrawn by the Secretary on February 12, 1981, for further consideration of regulatory alternatives. 46 Fed.Reg. 12214. On March 19, 1982, a notice of proposed rulemaking entitled "Hazard Communication" was published. 47 Fed.Reg. 12091.

The standard was published in its final form on November 25, 1983. 48 Fed.Reg. 53280. It requires that chemical manufacturers and importers "evaluate chemicals produced in their workplaces or imported by them to determine if they are hazardous." 29 C.F.R. § 1910.1200(d)(1). It refers to several compilations of toxic materials. These lists establish certain toxic substances which chemical manufacturers or importers must treat as hazardous. *Id.* at § 1910.1200(d)(3). Chemicals not included in the designated compilations must be evaluated to determine if they are hazardous by reference to "available scientific evidence." *Id.* at § 1910.1200(d). A manufacturer or importer of hazardous chemicals must "ensure that each container ... leaving the workplace is labeled" with the chemical identity, with appropriate hazard warnings, and with the name and address of the source. *Id.* at § 1910.1200(f)(1). Manufacturers or importers must also prepare a material safety data sheet (MSDS) containing the chemical common names of each hazardous ingredient, and information necessary for safe use of the product. *Id.* at § 1910.1200(g). The MSDS must be provided to each employer in the manufacturing sector (SIC Codes 20–39) purchasing a hazardous chemical. That employer must in turn make the MSDS available for employee inspection, *id.* at § 1910.1200(g)(8), and "shall provide employees with information and training on hazardous chemicals in their work area...." *Id.* at § 1910.1200(h). The rule allows an exception from the labeling and MSDS ingredient disclosure requirements when a chemical manufacturer or importer claims that the chemical identity is a trade secret, *id.* at § 1910.1200(i), and sets forth the procedure for disclosure of trade secrets when necessary. *Id.*

The rule provides expressly that

[t]his occupational safety and health standard is intended to address comprehensively the issue of evaluating and communicating hazards to employees in the manufacturing sector, and to preempt any state law pertaining to this subject.

29 C.F.R. § 1019.1200(a)(2).

## II.

The supremacy clause of article VI of the Constitution is the source of the federal doctrine of preemption of state law. Under the supremacy clause, federal preemption may occur in a number of ways. Preemption can be express or implied, "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). First, when acting within constitutional limits, Congress is empowered to preempt state law by so stating in express

terms. *Id.* at 525, 97 S.Ct. at 1309. In the absence of express preemptive language, Congress' intent to preempt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Hillsborough County, Fla. v. Auto. Med. Labs.,* 471 U.S. 707, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Preemption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state law on the same subject." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avacado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Moreover, the Supreme Court has repeatedly held that state laws can be preempted by federal regulations as well as by federal statutes. *Hillsborough County,* 105 S.Ct. at 2375.

In the present case, two of these "varieties" of preemption are alleged: express congressional preemption and express agency preemption.

A. *Preemption by Congress*

Plaintiffs contend that the Akron ordinance has been expressly preempted by Congress in the OSH Act. The Act does provide that once the Secretary of Labor has promulgated a standard, states are expressly preempted from regulating in that field except pursuant to section 18:

(a) Nothing in this Chapter shall prevent any state agency or court from asserting jurisdiction under state law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

(b) Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

29 U.S.C. § 667. The courts which have addressed the question have found that state "Right to Know" statutes are preempted by the Hazard Communication Standard as applied to employers in SIC Codes 20–39. *United Steelworkers of America v. Auchter,* 763 F.2d 728 (3d Cir. 1985); *New Jersey State Chamber of Commerce v. Hughey,* 774 F.2d 587, 593 (3d Cir.1985).

Plaintiffs argue that since states are preempted from regulating once OSHA issues a standard, a state's political subdivisions are necessarily precluded as well. Because political subdivisions are simply extensions of the state, which derive their power from the state, preemption must extend to these agencies of the state. Defendants, on the other hand, rely on the definition of state set forth in the OSH Act at section 3, where state is defined to "[include] a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands." 29 U.S.C. § 652(7). Defendants point out that Congress could easily have defined "states" to include their political subdivisions if it wished to preclude local regulation.

Plaintiffs also argue that because section 3 provides that the term "state" *includes* a State of the United States, etc., that the use of the word "includes" indicates that Congress foresaw an expansive reading of

the term "state." In this regard, plaintiffs rely on *Mayor of Boonton v. Drew Chemical Corp.*, 621 F.Supp. 663 (D.N.J.1985), where the court addressed whether municipalities could recover under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.* In CERCLA, as in the OSH Act, state is defined to "include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction." 42 U.S.C. § 9601(27). Nevertheless, the *Drew* court held that since Congress employed the term "include," the definitional section explicitly contemplated an expansion of the illustrative list by the courts to the fullest extent. 621 F.Supp. at 666.

The trial judge rejected plaintiffs' position. As to the first argument, that "states" necessarily includes their political subdivisions, the trial court pointed out that in numerous other statutes, Congress has expressly preempted "states and their political subdivisions" from regulating. *See, e.g.,* Clean Air Act Amendments of 1977, 42 U.S.C. § 7543 (1982); Medical Device Amendments of 1976, 21 U.S.C. § 360k (1982); Poison Prevention Packaging Act, 15 U.S.C. § 1476 (1982); Lead-Based Paint Poison Prevention Act, 42 U.S.C. § 4846 (1982); Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 1920(a) (1982); Egg Products Inspection Act, 21 U.S.C. § 1052(a) (1982); Consumer Products Safety Act, 15 U.S.C. § 2075 (1982); Flammable Fabrics Act, 15 U.S.C. § 1203 (1982). In addition, other portions of the OSH Act refer to "states and their political subdivisions." *See* § 655(b)(1) (Secretary may promulgate standards based upon information submitted by a political subdivision); § 667(c)(6) (an approved state plan must assure the Secretary that the state will establish an occupational safety and health program protecting employees of political subdivisions); § 673(b)(2) (Secretary may make grants to political subdivisions for

development and administration of statistical programs). Based on Congress' practice of explicitly preempting political subdivisions and the fact that political subdivisions are referred to in other sections of the OSH Act, the trial court concluded that Congress did not simply overlook including political subdivisions or that it implicitly included them in the word "state." We concur in the trial court's conclusion.

We also reject plaintiffs' second argument premised on *Drew.* The *Drew* court expansively defined "state," finding such a reading to be consistent with Congress' intent and with the remedial intent of CERCLA:

> It would be anomalous for this far reaching remedial statute to give states a cause of action for damages to natural resources owned by the State but for it to exclude cities from access to such a cause of action while expressly including resources owned by "local governments" within the scope of the protected subject of § 9607(a)(4)(C). As I have previously noted in my June 24 ruling, CERCLA should be given a broad and liberal construction.

621 F.Supp. at 666. Thus, the *Drew* court identified several reasons not present here for reading the term "state" expansively so as to give municipalities a claim for relief under CERCLA, not the least of which was that resources owned by local governments were protected under the Act.

We would also point out that if the term "state," as used in section 18 to preempt state regulation in the absence of an approved state plan implicitly includes political subdivisions as plaintiffs urge, then political subdivisions should also be able to regulate by submitting a "state" plan and obtaining the Secretary's approval. Otherwise, plaintiffs' argument would result in the word "state" having two different and distinct meanings at the same time.

The legislative history of section 3 gives no indication that regulation by political subdivisions was contemplated by Congress. When introducing the section which

contains the definition of "state," Senator Javits of New York stated:

> Mr. President, the *sole purpose* of this amendment is to make eligible to file what is called a State plan those territories and possessions of the United States which are spelled out in the amendment. This matter is not otherwise defined in the bill.

Subcomm. on Labor of the Sen. Comm. on Labor and Public Welfare, 92d Cong., 1st Sess., *Legislative History of the Occupational Health and Safety Act of 1970*, at 504 (1971) (emphasis added). The only expansive reading indicated by the legislative history would be that which would encompass "territories" and "possessions" within the definition.

Plaintiffs also argue that because municipalities are not sovereigns, but are merely agencies of the state, they cannot regulate where the state is precluded from regulating. Plaintiffs' reliance on authorities relating to other fields of law and on cases discussing the nature and source of municipal power to legislate is simply not persuasive in the context of preemption analysis.[3]

Plaintiffs additionally urge that *express* congressional intent to preempt local regulation can be found in Congress' desire to achieve uniformity of regulation. While acknowledging that Congress' primary intent in enacting the OSH Act was worker safety, plaintiffs argue that a further purpose, that of uniformity, may be discerned in certain provisions of the OSH Act and in comments made by the drafters of the Act. They submit that the Act's authors felt that uniformity would be necessary to promulgate an effective national standard and to avoid undue burden on interstate commerce.

Congress declared the purpose of the OSH Act in section 2:

> The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several states and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources
> . . . .

29 U.S.C. § 651(b). In *American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), the Supreme Court stated that "[w]hen Congress passed the Occupational Safety and Health Act in 1970, it chose to place pre-eminent value on assuring employees a safe and healthful working environment, limited only by the feasibility of achieving such an environment." *Id.* at 540, 101 S.Ct. at 2506.

Congress also set forth the considerations to be weighed by the Secretary when devising standards under the Act:

> The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life. Development of standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the em-

---

**3.** For instance, plaintiffs and *amici* argue that in constitutional analysis, political subdivisions are automatically encompassed within the term "state" for purposes of "state action" under the fourteenth amendment and other constitutional provisions. While this is so, political subdivisions are *not* included within the meaning of "state" under the eleventh amendment. *Mt.*

*Healthy Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Moreover, in *Mt. Healthy*, the Court distinguished Ohio cities and counties, as "political subdivisions," from other types of governmental agencies which are mere "arms of the state." *Id.*

ployee, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired.

§ 655(b)(5).

While the legislation and its history do illustrate that a national standard was felt to be essential to achieve the goals of the Act, they also indicate that this was to assure that the states would at least meet the minimum requirements of the federal standards, and not attempt to undercut each other. This conclusion is well supported by legislative history of section 18:

> Moreover, whenever a State wishes to assume responsibility for developing or enforcing standards in an area where standards have been promulgated under this act, the State may do so under a state plan approved by the Secretary of Labor. The plan must contain assurances that the State will develop and enforce standards at least as effective as those developed by the Secretary, that the State will have the legal authority, personnel and funds necessary to do the job, and that a right of entry into workplaces is provided.... In addition, the plan must contain assurances that the State will, to the extent possible under its law, establish and maintain an occupational safety and health program applicable to all employees of the State and its political subdivisions, and that such program will be as effective as that applicable to provide employers covered by the plan.
>
> ....
>
> As an encouragement for State action, the bill provides Federal financial support to assist the States in assuming their own programs for worker health and safety. Planning grants with up to 90 percent Federal participation, and program grants with up to 50 percent Federal participation are provided.

> The 90 percent grant is designed to aid the States in identifying needs, developing State plans and programs for collecting statistical data, increasing personnel capabilities, and improving administration and enforcement. The 50 percent Federal grant is made available to assist States in carrying out the occupational safety and health programs contained in their plans, as well as programs concerning occupational safety and health statistics.

S.Rep. No. 1282, 91st Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News, 5194–95 (1970). This same Senate Report discusses the preemptive effect of the OSH Act. Political subdivisions are not mentioned in any regard.

█ In short, we cannot accept plaintiffs' contention that Congress expressly preempted local regulation by these provisions establishing a national standard. Furthermore, we agree with the trial court to the extent that express preemption, by definition, must be clearly manifested, especially when local health and safety provisions are endangered. *Jones,* 430 U.S. at 525, 97 S.Ct. at 1309. There is, in fact, little in the legislation or its history to indicate Congress' intent as to whether state preemption includes preemption of local acts as well.

### B. *Preemption by OSHA Regulations*

█ Our inquiry does not end with divining congressional statutory intent, however, since state (or local) laws can be preempted by federal regulations as well as by federal statutes. *Hillsborough,* 105 S.Ct. at 2373. We must therefore determine whether the agency itself preempted local regulation when it promulgated the Hazard Communication Standard. We conclude that it did.

The Hazard Communication Standard is self described as a comprehensive hazard communication program:

> (2) This occupational safety and health standard is intended to address comprehensively the issue of evaluating and communicating chemical hazards to em-

ployees in the manufacturing sector, and to preempt any state law pertaining to this subject. Any state which desires to assume responsibility in this area may do so only under the provisions of section 18 of the Occupational Safety and Health Act (29 U.S.C. 651 et seq.) which deals with state jurisdiction and state plans. 29 C.F.R. § 1910.1200(a)(2). Once again, we are faced with the term "state" and its meaning as intended by OSHA. This time, however, some guidance has been provided.

In the preambles to both the proposed regulations and the final regulations, OSHA made evident its intent to preempt both state and local regulations. For instance, in the final regulations, while making clear that the primary intent of the standard was to protect employees, the agency also noted:

> Another reason many participants in the rulemaking support the need for a Federal standard is the recent proliferation of state and local right-to-know laws. Most companies in the manufacturing sector have business dealings which involve ·interstate commerce, and are thus subject to numerous different and potentially conflicting regulations.

48 Fed.Reg. 53,283 (1983).

> Approximately twelve states and six local governments have some type of regulation related to the identification of hazardous substances. About thirteen other states and three other local governments have introduced proposed legislation either in this legislative session or in previous sessions. They cover different lists of substances, have different reporting requirements, serve different purposes, have different labeling and material safety data sheet requirements, and have different educational and training requirements.
>
> ....
>
> The potential for conflicting or cumulatively burdensome State and local laws has been acknowledged by industry representatives to be immense. As stated above, this subject was cited in many comments submitted prior to the hearing,

in presentations made during the hearings, and in post-hearing comments.

> By promulgating a Federal standard, OSHA is in a position to reduce the regulatory burden posed by multiple state laws. In the final standard, OSHA preempts State laws which deal with hazard communication requirements for employees in the manufacturing sector, except in those States with a State plan which have a standard that regulates in this area.

*Id.* at 53,284.

The trial court refused to give effect to OSHA's intention to preempt as set forth in the preamble for two reasons. First, citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the court determined that it was prohibited from relying on the preamble in order to construe OSHA's intent in § 1910.1200(a)(2). The court ruled that express preemption found outside the text of the regulations was not effective.

*Brown*, however, is not controlling. The regulations under review in *Brown* were essentially treated by the agency as interpretative rules, and interested parties were not afforded the notice of proposed rulemaking required by substantive rules under the Administrative Procedures Act, 5 U.S.C. § 553(b). Because the regulations were not properly promulgated as substantive rules, and therefore were not the product of procedures which Congress prescribed as necessary prerequisites to give a regulation the binding effect of law, they could not be relied upon. 441 U.S. at 315, 99 S.Ct. at 1724.

Here, there is no question as to whether the regulations were validly promulgated. Moreover, both the proposed and final regulations, along with the preambles indicating OSHA's intent to preempt state and local laws, were published, and thus interested parties were given notice. In *Fidelity Federal Savings & Loan Assn. v. De La Cuesta*, 458 U.S. 141, 158, 102 S.Ct. 3014, 3025, 73 L.Ed.2d 664 (1982), the Court made clear that the preamble to a regula-

tion is valid evidence of the administrative construction of the regulation.

The trial court rejected *De La Cuesta*, stating that a preamble cannot have preemptive effect. We need not decide whether this is a correct ruling or not since the preamble here only stands as evidence of OSHA's intent as to the regulation which expressly states its comprehensive effect. In other words, we look to the preamble only after it becomes clear that OSHA intended the regulation to have preemptive effect; the preamble does not establish that intent, but only assists in determining the scope of OSHA's "comprehensive" standard.

The second reason the trial court gave for rejecting OSHA's attempt to preempt both state and local regulations was that such preemption would not be within OSHA's authority. Relying on the structure, provisions, and legislative history of the OSH Act, the trial court concluded that Congress intended that the law of political subdivisions should not be expressly preempted. Since OSHA's attempt to extend the preemptive effect of its regulations to localities, when localities are not expressly preempted by section 18 of the OSH Act, contradicted Congress' intent as construed by the trial court, the court held that the regulations could not operate to preempt the Akron ordinance.

The trial court was correct that OSHA may not preempt local law if that position is inconsistent with clearly expressed congressional intent. Nevertheless, as indicated above, we have been able to find no indication of congressional intent on this question. And if Congress has not directly addressed the precise question at issue, or the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's action is based on a permissible construction of the statute. *Chevron, U.S.A. Inc. v. Natural Resources Division*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formula-tion of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Id.* (citing *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)).

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

467 U.S. at 843–44, 104 S.Ct. at 2782–83. The Court has long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations "has been consistently followed by the Court whenever decision as to the meaning or reach of a statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.* at 844, 104 S.Ct. at 2782 (citations omitted).

Thus, if the choice made by the agency represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned. *Id.* at 845, 104 S.Ct. at 2783. The responsibility for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *Id.* at 866, 104 S.Ct. at 2793 (citing *TVA v.*

*Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978) ).

OSHA's desire to achieve uniformity, when not charged by Congress with such a goal, does not undercut the preemptive effect of the regulation. OSHA could legitimately determine that uniformity would aid in the administration and enforcement of, and compliance with, its standard. In other words, we cannot assume that OSHA has, in violation of its statutory mandate, put the desire for uniformity, i.e., minimizing the burden on commerce, ahead of its mission to provide a safe and healthful workplace. The regulations do not suggest that this is the case. In the absence of any clearly expressed congressional intent to the contrary, and giving OSHA the deference to which it is entitled, we hold that the Hazard Communication Standard preempts local regulation in SIC Codes 20–39.

### III.

Because of the nature of the trial judge's disposition of this case, she did not reach the question as to whether the entire ordinance is preempted. It is clear that the ordinance is preempted to the extent that it attempts to regulate employee safety in the workplace in SIC Codes 20–39. However, the ordinance also had as its purpose protection of the public and the providing of information to city fire fighters and public health officials regarding toxic and hazardous substances. It must also be determined whether the preempted provisions may be severed from the balance of the ordinance.

We decline to make these determinations for the first time on appeal. Rather, we will remand this matter to the district court to determine which portions of the ordinance are preempted and whether those portions that are not preempted are severable.

Accordingly, the judgment of the district court is REVERSED and this matter is REMANDED to the district court for further consideration consistent with this opinion.