**NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION, an Illinois not-for-profit corporation, Plaintiff–Appellant,**

v.

**Bernard KILLIAN, Director of the Environmental Protection Agency, an Illinois agency, in his representative capacity and Neil F. Hartigan, Attorney General of the State of Illinois, in his representative capacity, Defendants–Appellees.**

No. 89–3069.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1990.

Decided Nov. 14, 1990.

Rehearing and Rehearing En Banc Denied Jan. 29, 1991.

William P. Jones, Terence E. Flynn, Gessler, Flynn, Fleischmann, Hughes & Socol, Chicago, Ill., for plaintiff-appellant.

John A. Simon, Asst. Atty. Gen., William D. Seith, Christine S. Bucko, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and SNEED, Senior Circuit Judge.[1]

CUDAHY, Circuit Judge.

National Solid Wastes Management Association ("NSWMA") challenges the constitutionality of certain Illinois laws providing for the training, testing and licensing of hazardous waste site workers. According to NSWMA, the Illinois laws are preempted by the Occupational Safety and Health Act, 29 U.S.C. § 655 *et seq.* (the "OSH Act"), and regulations promulgated by the Occupational Safety and Health Administration ("OSHA"), and the Illinois acts also violate the commerce clause of the Constitution. U.S. Const. art. I, § 8, cl. 3. The district court upheld the Illinois legislation, striking one provision. We affirm in part and vacate in part.

## I. RELEVANT STATUTES AND REGULATIONS AND PROCEEDINGS BELOW

In recent years, popular concern about the environment has spurred legislators at all levels of government to enact laws aimed at abating existing pollution and preventing the creation of more pollution. In particular, legislators have focused on the special problems posed by so-called "hazardous" wastes. Congress has passed several measures designed to control and clean up hazardous wastes. *E.g.,* Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9601 *et seq.;* Resource Conservation and Recovery Act ("RCRA") and Solid Waste Disposal Act ("SWDA"), 42 U.S.C. § 6901 *et seq.* State and local governments, too, have addressed themselves to this important need.

Environmental measures enacted by state and local governments often address matters not covered by federal legislation or establish environmental standards higher than those provided by Congress. Many (if not most) states have created their own environmental protection agencies. The resulting patchwork of legislation and regulation emerging from government at various levels and reflecting different approaches to control has repeatedly generated issues of federal preemption of state and local laws, *see, e.g., International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), and state and local interference with interstate commerce, *see, e.g., Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Congress has in some specific instances expressed its intent to preempt particular kinds of state and local legislation, but it has not yet declared (or implied) its intention to occupy the entire field of environmental regulation. Consequently, courts have been obliged to address alleged conflicts between national and local legislation on a statute-by-statute (or regulation-by-regulation) basis. This is the background against which we now proceed to examine NSWMA's preemption and commerce clause challenges to the Illinois licensing statutes.

### A. *The Illinois Licensing Acts*

In 1988, Illinois enacted the Hazardous Waste Crane and Hoisting Equipment Operators Licensing Act, Ill.Rev.Stat. ch. 111, ¶ 7701 *et seq.* (the "Operators Act"), and the Hazardous Waste Laborers Licensing Act, Ill.Rev.Stat. ch. 111, ¶ 7801 *et seq.* (the "Laborers Act"). The Illinois General Assembly found that these two licensing acts would "promote job safety and ... protect life, limb and property...." Ill.Rev.Stat.

---

**1.** The Honorable Joseph T. Sneed of the Ninth     Circuit is sitting by designation.

674

ch. 111, ¶¶ 7702, 7802. The Operators Act covers persons working with cranes and hoists capable of lifting more than two tons, as well as their apprentices. The Laborers Act applies to all other general employees working at a hazardous waste cleanup site. Both acts require a license applicant to provide a certified record of at least 40 hours of training in order to work with hazardous waste under a program conducted within Illinois which has been approved either by the Illinois Environmental Protection Agency ("IEPA") or by the United States Environmental Protection Agency ("EPA"). Further, the applicant must be at least 18 years old, must not have violated any provisions of the relevant act and must pass a written examination "prescribed by" IEPA. *Id.* at ¶¶ 7705, 7706, 7805. Applicants for the Operator's License (but not apprentices) must clear another hurdle: they must submit "a certified record showing operation of equipment used in hazardous waste handling for a minimum of 4,000 hours...." *Id.* at ¶ 7705(d). Each year, all licensees must complete a refresher course of at least 8 hours of instruction in order to obtain renewal of their state license. *Id.* at ¶¶ 7707(b), 7806(b). The acts do not require licensing of persons working with equipment incapable of lifting more than 2 tons, persons engaged in agricultural or mining activities, persons employed by railroads or persons employed by the owner of a manufacturing facility undergoing cleanup pursuant to federal or state environmental laws so long as such employees have completed the training required by OSHA's Hazardous Waste Operations and Emergency Response regulations, 29 C.F.R. § 1910.120 (1989). *Id.* at ¶¶ 7704, 7804.

The acts also authorize the imposition of penalties for specified conduct. An employee subject to the acts who operates without a license, or an employer who knowingly permits such an individual to work without a license, may be fined from $1000 to $5000, depending on the existence of any previous such offenses. *Id.* at ¶¶ 7715, 7716, 7814. In addition, an individual's license may be suspended, revoked or denied renewal and the individual fined up to $5000 for obtaining or attempting to obtain a license by fraud; for committing gross negligence or demonstrating incompetence or misconduct in handling hazardous waste; for being convicted of any felony or being subject to a court order of involuntary commitment in a mental health facility; for failing to comply with any provision of the relevant Illinois act or for refusing to provide IEPA with information requested pursuant to a complaint or investigation; or for having one's operator's, apprentice's or laborer's license revoked in any other state. *Id.* at ¶¶ 7711, 7810. Under the acts, it is a public nuisance to perform work at a hazardous waste site or to operate or assist in the operation of a crane or hoist at a hazardous waste site without a license, and the Illinois Attorney General, the director of IEPA, any state's attorney or any resident citizen may bring a court action to enjoin an individual from working at a hazardous waste site without a license. *Id.* at ¶¶ 7714, 7813.

Finally, each act creates a five-member licensing board and provides for the appointment of an inspector to investigate accidents, monitor hazardous waste sites for compliance with the relevant act and provide advice to the relevant licensing board. The boards are to include two representatives of the relevant labor union or unions, two hazardous waste industry representatives and one member of the general public. Board members serve four-year terms and receive no salary for their service. Three members constitute a quorum, and the boards may submit recommendations to the director of IEPA concerning any aspect of the relevant licensing scheme. *Id.* at ¶¶ 7709, 7710, 7808, 7809.

B. *The OSHA Regulations*

In SARA, Congress authorized the Secretary of Labor to "promulgate standards for the health and safety protection of employees engaged in hazardous waste operations." SARA, Pub.L. No. 99–499, Title I, § 126(a), 100 Stat. 2690 (1986) (as amended Pub.L. No. 100–202, § 101(f), Title II, 101 Stat. 1329–198 (1987)). Section 126(a) of SARA directed the Secretary of Labor to

promulgate the standards pursuant to section 6 of the OSH Act, 29 U.S.C. § 655. Specifically, SARA required the Secretary to establish standards for site analysis, training, medical surveillance, protective equipment, engineering controls, maximum exposure limits, informational and new technology programs, handling of hazardous wastes, decontamination procedures and emergency responses. OSHA's Hazardous Waste Operations and Emergency Response regulations, 29 C.F.R. § 1910.120 (1989) (the "final rule"), are the product of this command. In addition to the subjects mandated by SARA, OSHA has also promulgated regulations pertaining to minimum illumination of worksites, monitoring of employee exposure levels and sanitation at temporary worksites.

NSWMA asserts that OSHA's regulations are "comprehensive," and draws our attention particularly to OSHA's worker training requirements contained in subsection (e) of the final rule. Subsection (e) requires training of all employees and supervisors working in the field (that is, with, or in close proximity to, the hazardous wastes). Initially, general site workers engaged in an activity that may potentially expose them to hazardous wastes must receive at least 40 hours of off-site training and three days of actual field experience under the supervision of a trained and experienced supervisor. 29 C.F.R. § 1910.120(e)(3)(i). Workers who are on the site only occasionally or who are working in areas that have been determined to be under the permissible exposure limits must complete at least 24 hours of off-site instruction and one day of actual field experience. *Id.* at §§ 1910.120(e)(3)(ii) and (iii). Managers and supervisors receive the same amount of off-site training and field experience as general workers, depending on whether they will be on site frequently or only occasionally, or whether they will be working in areas under the minimum exposure levels. In addition to this training, managers and supervisors must complete at least eight additional hours of spe-cialized training on topics that include the employer's safety and health program, the personal protective equipment program, the spill containment program and health hazard monitoring procedures and techniques. *Id.* at § 1910.120(e)(4).

Neither section 126 of SARA nor the OSHA final rule expressly declares that OSHA has exclusive authority to regulate on the subject of hazardous waste workers' health and safety. However, the OSH Act contains a general preemptive provision that states, in relevant part:

**(a) Assertion of State standards in absence of applicable Federal standards**

Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

**(b) Submission of State plan for development and enforcement of State standards to preempt applicable Federal standards**

Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

29 U.S.C. § 667 (hereinafter "section 18").[2]

### C.  *The District Court's Decision*

The district court conducted an evidentiary hearing at which both sides of this dispute submitted expert testimony. On the basis of the facts presented and his interpretation of the applicable law, the district judge concluded that Illinois licensing statutes were neither expressly nor implicitly preempted by federal law, except for the requirement that training be conducted within Illinois. The district judge struck the "within Illinois" provision because it

---

**2.**  Although it was SARA that authorized the creation of the final rule at issue here, section 18 of the OSH Act applies to the standards because they were promulgated under section 655 of title 29, as directed by section 126(a) of SARA.

could not contribute to Illinois's stated purpose of protecting public health.[3] The district judge refused, however, to consider NSWMA's commerce clause challenge because he believed the claim was not yet ripe since Illinois had not yet promulgated final rules for implementing the licensing statutes. On appeal, NSWMA contests the district court's analysis and renews its argument that the Illinois statutes should be stricken in their entirety on the basis either of federal preemption or of the commerce clause.

## II. NSWMA's PREEMPTION CHALLENGE

Preemption doctrine derives from the supremacy clause of the Constitution, U.S. Const. art. VI, cl. 2. NSWMA first argues that the OSHA final rule itself expresses preemptive intent, or, in the alternative, that section 18(b) of the OSH Act preempts the Illinois scheme because Illinois admits it has not submitted a plan pursuant to that section. NSWMA next contends that, even if the Illinois acts are not expressly preempted, they are implicitly preempted. In support of this theory, NSWMA asserts that Congress has "occupied the field" of worker health and safety regulation and that, in any event, the Illinois acts actually conflict with the OSHA final rule.

■ Federal regulations, like federal statutes, may preempt state or local laws. *Hillsborough County v. Automated Medical Labs, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Courts do not, however, lightly attribute to Congress or to a federal agency the intent to preempt state or local laws. Indeed, "we start with the assumption that the historic

police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest* purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (emphasis added). Environmental regulation has long been recognized as an "historic police power[ ] of the States." *See Huron Cement Co. v. City of Detroit,* 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). As we have observed, states continue to play a significant role in pollution prevention and abatement.

Illinois has stated that the licensing acts are designed "to promote job safety *and to protect life, limb and property* ...." Ill. Rev.Stat. ch. 111, ¶¶ 7702, 7802 (emphasis added). The italicized portion of the state's declared goal certainly expresses a valid state concern independent of worker health and safety. The difficulty we face here lies in determining whether a state law or regulation that addresses the same topic as a duly-promulgated OSHA regulation[4] may survive preemption simply because the state has asserted that its legislation is designed to achieve a legitimate state purpose in addition to worker health and safety.

■■ OSHA has in some cases declared its intent to preempt all state and local requirements on a particular aspect of worker health and safety regulation. *E.g.,* Hazard Communication Standard, 29 C.F.R. § 1910.1200(a)(2) (1989). However, we have found no similar statement in the Hazardous Waste Operations final rule, as it now stands.[5] Where the federal statute or regulation contains no explicit preemption clause, "[t]he purpose of Congress is

---

3. The Illinois defendants do not appeal from the district court's decision striking the "within Illinois" provision. It seems likely to us, in any event, that the "within Illinois" provision could not have survived NSWMA's commerce clause challenge, since the provision would have imposed a substantial burden on out-of-state workers and companies while making no discernible contribution to public safety. *See Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978).

4. NSWMA does not challenge the validity of OSHA's final rule.

5. OSHA has recently published proposed revisions to the final rule and invited comments. 55 Fed.Reg. 2,776 (proposed Jan. 26, 1990). If accepted, a new section 1910.121(b)(2) would require all states and territories to recognize OSHA-accredited training programs. If this revised rule becomes effective, NSWMA's challenges to the Illinois licensing statutes may become moot, at least insofar as they apply to planned operations (as opposed to emergency response operations).

the ultimate touchstone." *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978) (quoting *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963)). In such cases, we examine the federal scheme to determine whether the state law or regulation would conflict with or frustrate the federal purpose or whether Congress or the federal agency has expressed an intent to occupy the whole field, leaving no room for supplemental state regulation. *Malone*, 435 U.S. at 504, 98 S.Ct. at 1190. Ordinarily, the mere comprehensiveness of federal regulations will not lead to a determination that state laws have been preempted. *Hillsborough County*, 471 U.S. at 717–18, 105 S.Ct. at 2377–78 (observing that agencies typically go into greater detail than Congress and that agencies possess a variety of media—including preambles, interpretative statements and responses to comments—in which to express preemptive intent). We note that OSHA has explicitly attempted to avoid broad preemptive effect in promulgating the final rule here. In its "federalism" discussion accompanying the final rule, OSHA explains that it "has used its regulatory preemption of State law to the minimum level necessary to achieve the objectives of the OSH Act and section 126 of SARA." 54 Fed.Reg. at 9315 (Mar. 6, 1989). Since the OSHA final rule denies broad preemptive intent, we proceed to consider whether the Illinois statutes are expressly preempted by section 18 of the OSH Act.

█ The language of section 18 of the OSH Act does not indicate whether a state law or regulation that purports to serve a dual purpose is preempted. The structure and legislative history of section 18 does, however, demonstrate that Congress hoped to encourage states to participate in worker health and safety regulation by submitting their own state plans. If no OSHA standard exists, a state is permitted by section 18(a) to enact its own—until OSHA

steps into the field. However, section 18 unquestionably preempts any state law or regulation whose sole purpose and effect is to establish a standard pertaining to worker health and safety where OSHA has already promulgated such a standard and the state has not obtained the Secretary of Labor's approval for its own plan. The original Senate version of what is now section 18 would have permitted states, without having to obtain approval of a state plan, to impose during a transitional period stricter requirements than those established by OSHA. But that provision was eliminated from the final draft of the bill. *See* H.Rep. No. 91–1765, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5177, 5228, 5238. Despite the deletion of this provision, however, and contrary to NSWMA's argument, section 18 does not evidence a congressional intent to achieve uniformity in worker health and safety regulation: if uniformity of standards were a principal goal of the Act, state plans certainly would not be an ideal mechanism to achieve that purpose. *See* Note, *The Extent of OSHA Preemption of State Hazard Reporting Requirements,* 88 Colum.L.Rev. 630, 642–43 (1988); Note, *Getting Away with Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents,* 101 Harv.L.Rev. 535, 550–51 (1987). Thus, it seems clear from the language of section 18 that a state may impose stricter worker health and safety standards than those promulgated by OSHA, but only after having obtained OSHA's approval of that state's plan.

█ While the legislative history regarding the preemptive effect of section 18 is not entirely clear, OSHA has explicitly stated its view that section 18 prohibits a state from asserting jurisdiction over any occupational safety and health issue with respect to which a federal standard already exists, unless the state acts pursuant to a federally approved state plan. 29 C.F.R. § 1901.2 (1989).[6] This interpretation of

**6.** 29 C.F.R. section 1901.2 reads, in pertinent part:

Section 18(a) of the [OSH] Act is read as preventing any State agency or court from

section 18 is reflected in the OSHA final rule at issue here. OSHA states in the "federalism" discussion accompanying the rule:

> *Those states which have elected to participate under section 18 of the OSH Act* would not be preempted by this final regulation and would be able to address special, local conditions within the framework provided by this performance oriented standard while ensuring that their standards are at least as effective as the Federal standard.

54 Fed.Reg. at 9316 (emphasis added). When a federal statute "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Although section 18's express preemptive effect appears to be unambiguous, we note that, in any event, OSHA's construction confirms the view that a state must submit a state plan under sections 18(b) and (c) of the OSH Act before it can exercise jurisdiction over a federally regulated occupational safety and health matter.

Further, this interpretation of section 18 has received broad acceptance among federal and state courts. *See Associated Indus. of Mass. v. Snow,* 898 F.2d 274, 278 (1st Cir.1990); *Environmental Encapsulating Corp. v. City of New York,* 855 F.2d 48, 55 (2d Cir.1988); *New Jersey Chamber of Commerce v. Hughey,* 774 F.2d 587, 592 (3d Cir.1985), *appeal after remand,* 868 F.2d 621 (3d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3246, 106 L.Ed.2d 593 (1989); *Farmworker Justice Fund, Inc. v. Brock,* 811 F.2d 613, 625–26, 640–41 (D.C. Cir.1987), *opinion vacated on other grounds,* 817 F.2d 890 (D.C.Cir.1987); *Ohio Mfrs. Ass'n v. City of Akron,* 801 F.2d 824, 828 (6th Cir.1986), *appeal dismissed and*

*cert. denied,* 484 U.S. 801, 108 S.Ct. 44, 98 L.Ed.2d 9 (1987); *People v. Hegedus,* 432 Mich. 598, 443 N.W.2d 127, 131 (1989); *Thornock v. State,* 229 Mont. 67, 745 P.2d 324, 328 (1987); *Stanislawski v. Industrial Comm'n,* 99 Ill.2d 36, 75 Ill.Dec. 405, 406–07, 457 N.E.2d 399, 400–01 (1983); *United Air Lines v. Occupational Safety and Health Appeals Bd.,* 32 Cal.3d 762, 187 Cal.Rptr. 387, 393–94, 654 P.2d 157, 163–64 (1982); *P & Z Co. v. District of Columbia,* 408 A.2d 1249 (D.C.App.1979); *State v. GTE Valeron Corp.,* 155 A.D.2d 166, 553 N.Y.S.2d 555, 557 (1990); *Lepore v. National Tool and Mfg. Co.,* 224 N.J.Super. 463, 540 A.2d 1296, 1306 (App.Div.1988), *aff'd,* 115 N.J. 226, 557 A.2d 1371 (1989) (per curiam), *cert. denied,* — U.S. —, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989); *Sabine Consol., Inc. v. State,* 756 S.W.2d 865, 868 (Tex.Crim.App.1988). We have discovered no case contradicting the view that section 18 expressly prohibits states without federally approved state plans from exercising jurisdiction over an occupational health and safety matter as to which OSHA has already duly promulgated a federal standard.

■ The question we face in the present case, of course, is not whether Illinois may promulgate its own health and safety standards for hazardous waste workers in the absence of a federally-approved state plan. Rather, Illinois asserts that its licensing laws serve a *dual* purpose: protection of workers *and* protection of the public. The problem is that many (if not most) of the provisions of the Illinois statutes address both worker health and public health *simultaneously* and through direct regulation of hazardous waste workers. It is impossible in reviewing some of the statutes' provisions to disengage the public health interest from the worker health interest. We must decide, therefore, whether the mere assertion of a concurrent public health purpose can save Illinois's regula-

---

asserting jurisdiction under State law over any occupational safety or health issue with respect to which a Federal standard has been issued under section 6 of the Act.... [The alternative provided by section 18(h) to exclusive Federal jurisdiction] is temporary and

may be considered a step towards the more permanent alternative to exclusive Federal jurisdiction provided by sections 18(b) and (c) following submission and approval of a [State] plan....

tion of hazardous waste workers from preemption.[7] We conclude that it cannot.

It would defeat the purpose of section 18 if a state could enact measures stricter than OSHA's and largely accomplished through regulation of worker health and safety simply by asserting a non-occupational purpose for the legislation. Such unauthorized state regulation in this case could result in duplication and unwarranted additional costs to workers and employers. Under the Illinois licensing laws, hazardous waste workers whose occupation may take them to Illinois must, among other things, undergo an IEPA or EPA-approved training course for 40 hours (in addition to an OSHA-approved course), pass an IEPA-prescribed written test and, in the case of crane and hoist operators, demonstrate that they have worked with such equipment for at least 4000 hours (40 hours per week for two years). Some of these provisions might well duplicate (or even conflict with) OSHA's training requirements. Section 18 is designed to avoid subjecting workers and employers to duplicative regulation, while allowing states the flexibility to tailor worker health and safety programs to their own needs.

When an OSHA standard exists, and the state has not submitted a section 18 plan, we undertake a two-step inquiry. First, we determine whether the challenged state law or regulation constitutes, in a direct, clear and substantial way, regulation of worker health and safety. A key factor in resolving this question is whether the state law affects employer-employee obligations with respect to health and safety matters in the workplace. Second, we attempt to extricate from the state law or regulation and invalidate those provisions that relate to worker health and safety in a direct, clear and substantial way. In this

connection, we must strike any provision with a dual purpose and effect from which the worker health and safety aspect cannot be removed.[8] Any other approach would threaten to undermine Congress's intent that states wishing to establish more stringent standards than OSHA's—for whatever reason—submit plans to the Secretary of Labor for approval before going forward with their schemes.

Our test for OSHA preemption of a state law or regulation corresponds closely to the test recently announced by the Supreme Court for application to state laws allegedly impacting upon the federally-reserved field of nuclear health and safety. *English v. General Electric Co.*, —— U.S. ——, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). The Court referred in *English* to its earlier decision in *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 211–12, 103 S.Ct. 1713, 1726, 75 L.Ed.2d 752 (1983), in which the Court held that a state law that did not affect radiological health and safety was not preempted by the Atomic Energy Act. The *Pacific Gas* holding corresponds to step one of our test for OSHA preemption. In *English*, the Court also noted that part of the inquiry into the validity of the state law focuses on the *purpose* of the state law, and another part of the inquiry examines the state law's *actual effect* on nuclear safety. 110 S.Ct. at 2278. The *English* test for validity of a state law arguably affecting nuclear health and safety issues examines whether the state law has a *"direct and substantial effect* on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.* (emphasis added). The effect must, therefore, be more than tangential or incidental, as we have stated with respect

---

7. NSWMA repeatedly stresses OSHA's recognition that, in the case of hazardous waste cleanup sites, the work environment is coterminous with the general environment. We do not understand this statement by OSHA to imply that OSHA intended its final rule to wholly displace any environmental regulation by the states of hazardous waste sites. Moreover, OSHA is not empowered to promulgate environmental regulations that have no discernible bearing on

worker health and safety, and we will not assume, based only on NSWMA's allegation, that OSHA has exceeded its statutory delegation of power.

8. Whether provisions of a state act or regulation are severable is, of course, a question of state law.

to state laws challenged under section 18 of the OSH Act.[9]

To date, three other circuits have grappled with the question whether the assertion of a proper state purpose will prevent a state law or regulation pertaining to worker health and safety from being preempted by an OSHA standard. *Associated Indus. of Mass. v. Snow*, 898 F.2d 274 (1st Cir.1990); *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48 (2d Cir.1988); *New Jersey State Chamber of Commerce v. Hughey*, 774 F.2d 587 (3d Cir.1985) ("*Hughey I*"), *appeal after remand*, 868 F.2d 621 (3d Cir.) ("*Hughey II*"), *cert. denied*, —— U.S. ——, 109 S.Ct. 3246, 106 L.Ed.2d 593 (1989); *Manufacturers Ass'n of Tri–County v. Knepper*, 801 F.2d 130 (3d Cir.1986), *cert. denied*, 484 U.S. 815, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987). The First and Second Circuits have upheld

state regulation of the workplace when such regulation evidences a substantial and legitimate state purpose or effect separate from (but in addition to) worker health and safety. The Third Circuit's position is somewhat more complex.

The Third Circuit was the first federal court of appeals to deal with the issue of section 18 preemption of dual purpose state laws. In *Hughey I, Hughey II*, and *Knepper*, the court considered the validity of state "right to know" laws in light of OSHA's Hazard Communication standard, 29 C.F.R. § 1910.1200. That standard expressly preempts any state or local law pertaining to the subject of hazard communications to employees.[10] Right to know laws are generally designed to disseminate information to public officials and citizens (and, in some cases, employees) about the types of hazardous materials present in the

---

**9.** Of course, as in the nuclear health and safety context, *see English*, 110 S.Ct. 2270 (state' law action for intentional infliction of emotional distress was not preempted by Atomic Energy Act); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (Atomic Energy Act did not preempt application of state law punitive damage rule to state law tort action), a state criminal statute or tort liability rule would not be preempted. Such state laws are not "standards" within the meaning of 29 U.S.C. section 652(8). Moreover, the OSH Act contains a broad savings clause, which provides:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

29 U.S.C. § 653(b)(4).

To date, all but one court that have considered the question of section 18's preemptive effect upon state criminal and tort rules has concluded that section 18 does not preempt such laws. *Paige v. Henry J. Kaiser Co.*, 826 F.2d 857 (9th Cir.1987) (California had federally approved state plan, which did not preempt wrongful discharge claim), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988); *McElroy v. SOS Int'l, Inc.*, 730 F.Supp. 803 (N.D. Ill.1989) (OSH Act does not preempt state law remedy for retaliatory discharge); *Hegedus*, 443 N.W.2d 127 (OSH Act does not preempt enforcement of state criminal statutes); *People v. Chicago Magnet Wire Corp.*, 126 Ill.2d 356, 128 Ill.Dec. 517, 534 N.E.2d 962 (1989) (OSH Act does not

preclude enforcement of state criminal law as to conduct regulated by OSHA standard), *cert. denied sub nom. Asta v. Illinois*, —— U.S. ——, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989); *P & Z Co. v. District of Columbia*, 408 A.2d 1249 (D.C.App. 1979) (criminal prosecution for employer's failure to report workplace injuries was not preempted by OSHA standard); *People v. Pymm*, 151 A.D.2d 133, 546 N.Y.S.2d 871 (1989) (OSHA standard does not bar criminal prosecutions for violations of state law), *appeal granted*, 75 N.Y.2d 774, 551 N.Y.S.2d 916, 551 N.E.2d 117 (1989); *Lepore*, 540 A.2d 1296 (state law retaliatory discharge action is not preempted by OSHA standard); *State ex rel. Cornellier v. Black*, 144 Wis.2d 745, 425 N.W.2d 21 (App.) (homicide prosecution not barred by OSHA standard), *review denied*, 145 Wis.2d 916, 430 N.W.2d 351 (1988). *See generally* Note, *Getting Away with Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents*, 101 Harv.L.Rev. 535 (1987).

The only case we have located that does interpret section 18 as barring state law-based criminal actions is *Sabine Consolidated, Inc. v. State*, 756 S.W.2d 865 (Tex.Crim.App.1988). That case, however, relied heavily on the rationale of the Illinois appellate decision in *Chicago Magnet*, which has been reversed by the Illinois Supreme Court. Thus, it is questionable whether the Texas courts would continue to follow *Sabine* in light of the increasing body of case law suggesting that *Sabine* is incorrect.

**10.** At the time *Hughey I* and *Knepper* were decided, the preemption applied only to regulation of the manufacturing sector. OSHA has now extended the standard and the preemption to all sectors.

community. The Third Circuit in *Hughey I* analyzed each aspect of the New Jersey right to know law and declared preempted those provisions which evidenced a "primary purpose" to protect worker health and safety, as opposed to public health and safety.

The New Jersey law required employers, among other things, to complete surveys and compile lists of "environmental hazards" and "workplace hazards." The Third Circuit held that the OSHA standard preempted the state provision to the extent it required a listing of substances deemed solely workplace hazards. Thus, New Jersey could require that employers report substances that present a hazard both to the workplace and to the general environment. Moreover, the court upheld New Jersey's labelling requirement for all substances on the environmental hazards list, even though some of those substances were also subject to the OSHA standard. The listing and labelling requirements upheld by the Third Circuit not only had an identifiable purpose and probable effect of dispensing information to workers and nonworkers alike about the environmental hazards of certain substances but were also derived from different sources than the workplace hazard listing and labelling provisions that the court struck.[11] Thus, while some substances were subject to both OSHA and New Jersey regulation, the nature of the state's regulation was quite different from the nature of OSHA's. Further, the mere compilation of lists of hazardous substances that might be discharged into the environment does not amount to regulation of the workplace in any meaningful sense: workers would benefit from the environmental hazards list not through their status as workers; rather, they would benefit in the same way and to the same degree as all members of the

general public. Consequently, items upheld in *Hughey I* under the "primary purpose" test would also survive preemption under our analysis.[12]

In *Knepper*, the Third Circuit applied its "primary purpose" test to Pennsylvania's right-to-know law, which differed in some significant respects from the New Jersey law addressed in *Hughey*. All suppliers were required by the Pennsylvania law to label the hazardous contents of containers shipped to anyone, whether an employer or not. The content of the labelling requirements was compatible with OSHA's in all respects, so the court concluded that the supplier labelling requirement was neither expressly nor implicitly preempted by the OSHA standard. However, the court struck an employer labelling requirement, since it exempted any employer not having any present employees. The court inferred from the exemption that the employer labelling requirement really had as its chief purpose the communication of hazards to employees. The Pennsylvania law also required employers to list *all* hazardous substances that had been present in the workplace during the previous year, including all substances appearing on the OSHA list. But the state law required inclusion of substances identified by ten other sources as well and directed that the final list be supplied on request to local police, fire and other emergency response agencies. Further, any member of the public could obtain access to the list from the Pennsylvania Department of Labor and Industry. The Third Circuit upheld this provision because it relied on a broader base of information than OSHA's list and evidenced a different purpose than workplace safety. The court did, however, strike a provision of the state law requiring every employer to post a list of all hazardous substances found in its workplace and all environmental hazards

**11.** The New Jersey environmental hazard list was to be compiled from employer reports, whereas OSHA's regulation provided for identification of substances by the original manufacturer or importer of each substance. *See Hughey I,* 774 F.2d at 594.

**12.** In *Hughey II,* a different panel of the Third Circuit reviewed the decision of the district

court to which the *Hughey I* panel had remanded the case for additional proceedings. The *Hughey II* panel felt itself bound by the "primary purpose" methodology adopted by the *Hughey I* panel and reaffirmed that panel's decision on the effect of section 18 upon the New Jersey act.

discharged from its workplace. The court interpreted this section as requiring notification to employees of workplace hazards, which was preempted by the OSHA standard. 801 F.2d at 138. In any event, any worker could obtain the entire list of substances from the state Department of Industry and Labor in her capacity as a citizen.[13]

Our analysis would not change the results in *Knepper* with respect to the labelling and listing of environmental hazards.[14] A container filled with an environmentally hazardous substance may pass from one hand to another, ultimately finding its way to a landfill or other dump site. The state has a strong interest—one wholly independent of workplace safety regulation—in ensuring that those who handle the container know what is in it so that it is not disposed of carelessly. Likewise, compiling lists of environmentally hazardous substances present in the community and giving firefighters and other officials, as well as citizens, access to these lists is not workplace regulation. That some items might appear on both Pennsylvania's and OSHA's lists is not determinative. Nor is it relevant that the source of the items might in some cases be employers. The question is whether the state regulation affects employer-employee obligations more than incidentally with respect to a worker health and safety issue. As with the New Jersey law, any additional benefit reaped by workers from the labelling and listing of environmental hazards would be incidental to the benefit bestowed upon the public at large by the requirements.

The Third Circuit also examined in *Knepper* the Pennsylvania law's requirements with regard to employer educational programs and state outreach programs. The Third Circuit determined that Pennsylvania could require employers to conduct education programs for their employees concerning *environmental* hazards (but not workplace hazards). 801 F.2d at 142. Similarly, the court upheld a provision directing the Department of Industry and Labor to develop outreach programs to inform the public *and employees* about environmentally hazardous substances, but the court struck the provision to the extent it applied to communication of information about *workplace* hazards to employees. *Id.* In analyzing these two provisions, the Third Circuit was able to extricate the proper state interest in environmental regulation from regulation of worker health and safety. Thus, these provisions, as edited by the Third Circuit, would also survive under our approach.

The difficulty we experience with the Third Circuit's "primary purpose" test—although we would reach virtually the same results applying our own analysis as those reached by the Third Circuit in *Hughey* and *Knepper*—is epitomized by Illinois's 4000-hour operating experience requirement. In neither *Hughey* nor *Knepper* did the Third Circuit confront a true "dual purpose"

---

**13.** It is not clear why the *Knepper* court struck the posting requirement insofar as it applied to employee notification of *environmental* hazards discharged from the workplace. This holding seems to conflict with the court's determination that Pennsylvania could require employers to educate employees about environmental hazards (but not about workplace hazards, since the OSHA standard already provided for that). Under our approach, both the posting and the training requirements would be upheld insofar as they applied to informing employees about *environmental* hazards.

**14.** The Third Circuit also upheld the Pennsylvania law's requirement that suppliers of hazardous substances provide all purchasers with Material Safety Data Sheets ("MSDS"). OSHA's standard contained a nearly identical requirement. Like the environmental hazards lists, however, the Pennsylvania MSDS provision applied to more substances than OSHA listed and was directed at those who supply the substances. 801 F.2d at 140–41. The Third Circuit declined to find the Pennsylvania MSDS provision preempted as it applied to *suppliers,* but the court did strike the state law's requirements that employers disclose to employees the contents of each MSDS. The court made no distinction between those MSDS's for environmental hazards and those for solely workplace hazards. Rather, the court focused on the status of the parties giving and receiving the communications, so as to avoid impinging upon OSHA's province. The law was struck only to the extent it required a hazard communication between employers and their employees. Again, though, we think the state's law could have been upheld as it applied to communication of *environmental* hazards to workers.

problem: the labelling and listing requirements were not truly workplace regulations, although they did have some effect on worker health as one aspect of general public health. The offending requirements of the other provisions addressed by the Third Circuit which did directly, clearly and substantially regulate worker health and safety were extricable from the requirements designed to fulfill a proper state goal. But Illinois's 4000-hour rule directly, clearly and substantially implicates worker health and safety as well as public health and safety, and it is impossible to modify the provision so as to delete matter serving the impermissible worker health and safety goal without also eliminating matter serving the permissible public health and safety goal.[15] Under the Third Circuit's test, the 4000-hour requirement might survive, since it is directed both to worker health and safety and to "broader" concerns. We think such a result would clearly undermine the purpose of section 18.[16]

Nor do the Second and First Circuit's recent decisions give us satisfactory assistance in resolving this problem. The Second Circuit disavowed the "primary purpose" test, since it appeared too difficult in many cases to determine what is a "primary" purpose and what a secondary or tertiary purpose. Instead, the Second Circuit reviewed the challenged legislation—a New York City ordinance regulating training in asbestos handling—for a "legitimate and substantial purpose apart from the promotion of occupational health and safety." *Environmental Encapsulating*, 855 F.2d at 57. Applying this test, the Second Circuit excised two provisions of the ordinance that evidenced only a worker health and safety purpose. But the court left intact the remainder of the ordinance, much of which covered items already addressed in OSHA's standard on the same topic (e.g., personal hygiene, personal protective equipment, preparation of the work area). The city's training program was more rigorous than OSHA's, and, unlike OSHA, the city required testing and certification of all asbestos handlers. Reviewing a preemption challenge to Massachusetts's asbestos handling training and certification regulations, the First Circuit rejected both the Second Circuit and the Third Circuit approaches because those courts' tests require inquiry into legislative history—a highly speculative business. Instead, the First Circuit examined the *effect* of the challenged statute. Because the court found that the state's training and certification requirements had the effect of protecting public health, it concluded that the OSHA standard did not preempt the state act.[17]

---

**15.** Evidence submitted to the district court on the public health interest behind the 4000-hour rule was inconclusive: no expert was able to identify the point at which the "learning curve" begins to plateau, indicating that additional operating experience will yield only marginal or negligible increases in worker health and safety or public health and safety. Moreover, Illinois has not set out to explain why a worker whose experience suggests she is sufficiently competent to satisfy worker health and safety concerns would not also be sufficiently competent to satisfy public health and safety concerns.

**16.** A New Jersey district court has interpreted the Third Circuit's *Hughey* and *Knepper* opinions in a manner that makes those decisions wholly compatible with our approach in the present case. Analyzing a preemption challenge to New Jersey's Asbestos Control and Licensing Act, Judge Debevoise—the same district judge who presided over the *Hughey* litigation—recognized the difficulty of applying the primary purpose test to a true dual purpose state regulation. *New Jersey Chamber of Commerce v. New Jersey*, 653 F.Supp. 1453, 1465 (D.N.J.1987). In this context, Judge Debevoise concluded that "*Hughey [I]* and *Knepper* must be read to hold that unless the state provisions are directed specifically towards non-occupational safety concerns, they are expressly preempted, since OSHA has chosen to occupy this field.... The allegation of an additional purpose for [the state's] scheme does not render it immune from preemption." *Id.* at 1466.

**17.** It is not entirely clear whether the First Circuit based its decision solely on the question whether the state act had a public health effect: the court observed that the Massachusetts training curriculum was modelled after EPA's Asbestos Hazard Emergency Response Act ("AHERA"), 15 U.S.C. §§ 2641 *et seq.*, which requires states to implement such training and certification programs in conjunction with EPA. *Id.* at § 2646. The court noted that EPA's program was directed at the protection of public health and, as a section of the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, was expressly defined *not* to be an occupational health and

The district court in this case followed the Second Circuit's approach. But in our view, both the Second Circuit's and the First Circuit's analyses contain serious flaws. As the First Circuit persuasively observed, the Second Circuit—like the Third—relies too heavily on an assessment of the legislature's subjective purpose. Merely asserting a desire to protect public health and safety cannot save a provision that infringes upon OSHA's province. At the same time, the likelihood that a particular provision will have a beneficial *effect* upon public health and safety is on no better ground than a provision supported by a proper state *purpose*. Section 18 is clear: where OSHA has properly established a standard, a state may not create a standard of its own on the same topic unless the state acts pursuant to a plan approved by the Secretary of Labor. Illinois, if it wishes to enact laws or to impose regulations that it believes would more adequately account for the state's environmental and public health concerns, may submit to OSHA a state plan pursuant to sections 18(b) and (c) and thereby displace the application of OSHA's final rule to workers within Illinois. But the state cannot regulate worker health and safety under the guise of environmental regulation.

As we have already intimated, we disagree with the district court's conclusion that Illinois's 4000–hour operating experience requirement may survive preemption simply because the rule may also enhance public health and safety. There is clearly no way to separate the worker health and safety aspect of the requirement from the public health and safety aspect. Thus, the entire requirement must fall.

Many of the Illinois statutes' provisions lack concrete form at this time because the implementing regulations have not yet reached final form. For example, the Illinois statute does not specify the contents of the required training program or the written test. We therefore vacate the judgment and remand to the district court for application to the Illinois licensing statutes of the principles we have described.[18] Because we base our decision on section 18, we do not address NSWMA's alternative contentions that the Illinois acts actually conflict with the OSHA final rule and that OSHA has occupied the field.

### III. NSWMA's COMMERCE CLAUSE CHALLENGE

Since we have determined that the 4000–hour rule is preempted, we do not address NSWMA's appeal from the district court's dismissal of NSWMA's commerce clause claim for lack of ripeness. Similarly, since the district court struck the "within Illinois" requirement for training and testing on preemption grounds, and since the Illinois defendants do not appeal that decision, we leave the district court's judgment on that issue undisturbed.

We are, however, concerned about the potential burden on interstate commerce suggested by the exemption of certain classes of employees from the requirements of the Illinois statutes. It is not clear why Illinois would choose to exempt agricultural, mining and railroad workers from the statutes' training and testing provisions; it is even less clear why the employees of a manufacturing facility that is undergoing an environmental cleanup pursuant to state or federal law should be exempt from satisfying Illinois's requirements, so long as they have completed OSHA's required training. In this connection, we note that such exemptions may suggest an intent by a state to discriminate

---

safety measure, *id.* at § 2608(c). *See Associated Industries*, 898 F.2d at 280 & n. 6. Thus, the remainder of the First Circuit's opinion in *Associated Industries* may be dicta.

**18.** If on remand the district court determines that some but not all of the licensing statutes' provisions are preempted by the OSHA final rule, the district court will, of course, be obliged to determine whether Illinois law permits the severance of the offending provisions without requiring that the statutes be stricken in their entirety. In this connection, we note that Illinois does have a general severability provision, which instructs that a holding that the invalidation of one provision of an act "does not affect other provisions or applications of the [a]ct which can be given effect without the invalid application or provision...." Ill.Rev.Stat. ch. 1, ¶ 1032.

against interstate commerce in favor of local interests. In *Raymond Motor Transport, Inc. v. Rice*, 434 U.S. 429, 446–47, 98 S.Ct. 787, 796–97, 54 L.Ed.2d 664 (1978), the Supreme Court observed that statutory exceptions which on their face discriminate in favor of local industry or which, although facially neutral, primarily benefit local industry "weaken the presumption in favor of the validity of the general limit [prescribed by the statute], because they undermine the assumption that the State's own political processes will act as a check on local regulations that unduly burden interstate commerce." On remand, therefore—assuming that some portions of the Illinois statutes survive preemption analysis—the district court should inquire into the purpose and likely effect of these exemptions and determine whether they unduly burden interstate commerce.

### IV. CONCLUSION

The district court's judgment is VACATED and REMANDED for further proceedings consistent with this opinion.

EASTERBROOK, Circuit Judge, dubitante.

The court's opinion establishes a simple approach to preemption under § 18 of OSHA. Although phrased as two steps, it boils down to this: Any rule that affects workers' health and safety in a direct, clear, and substantial way is preempted, even if that rule serves a purpose other than, or in addition to, workers' health and safety. This is superior to the standards created by the second and third circuits because it dispenses with questions about legislative intent (the "intent" of a collective body is a construct, not a fact) and superior to the standard of the first circuit, which does not inquire into intent, because it avoids weighing the importance or substantiality of effects, a legislative task.

Still, I am not so sure as my colleagues that § 18 preempts state rules. The court says that § 18 "unquestionably preempts" state law (918 F.2d at 677), is "clear" (*id.* at 677, 684), is "express" and "unambiguous" (*id.* at 678), and "expressly prohib-

its" states from regulating without submitting their plans to the federal government (*id.* at 678). All these "clearly"s demonstrate more certitude than § 18 warrants.

Section 18(a) says that "[n]othing in this chapter shall prevent any State ... from asserting jurisdiction over any occupational safety or health issue with respect to which no [federal] standard is in effect". This does *not* continue by saying that if there is a federal standard, then state law is preempted. Section 18(b) continues:

> Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.

This sounds like an option for the states, not like a constraint. A state may take over the subject—that is, oust OSHA's rule. Before doing this, however, it must secure federal approval. Section 18(b) does not say that if a state wants to *add* to the body of rules, while leaving federal standards (and enforcement) unaffected, it needs federal permission.

The court treats § 18(b) as if it read:

> *No* State *may*, at any time, ... assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title *unless it has submitted* a State plan for the development of such standards and their enforcement.

The strongest support for this reading, although one the court does not give directly, is a negative implication. From the listing in § 18(a) and 18(b) of two ways the state may apply its law, coupled with the preservation in § 4(b)(4), 29 U.S.C. § 653(b)(4), of workers' compensation laws, the court infers that there are no others. It is an application of the maxim *expressio unius*

*est exclusio alterius.* Although this maxim is misleading more often than it is helpful—for it does not say *why* a court ought infer that every list is exclusive—the idea has some power here. Federal regulations of health and safety are supposed to do enough to protect those interests. If states then do more, they are doing too much: they are achieving increasingly small benefits at increasingly high cost, into the range of negative returns. If states are not doing more, but are simply doing something different, then there is a substantial risk of the two sovereigns getting in each others' way, of too many cooks spoiling the broth. So either the "more" or the "different" variation seems to imply preemption. Congress recognized this possibility and sought to avert preemption, but limited its salvation to three classes of cases. It follows that Illinois is trying to use a route closed to the states.

Attractive as this conclusion is, the argument is overstated. It paradoxically treats preservation of state law as interdiction, for many federal laws lack anti-preemption clauses yet state laws are allowed to coexist with federal regulation. To treat anti-preemption clauses as if they implicitly preempt all they do not save may invert the proper result.

Federal regulatory systems do not invariably (or even frequently) imply that states lack authority to regulate on their own. *English v. General Electric Co.,* — U.S. ——, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (nuclear safety); *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (antitrust); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (medical safety); *Amanda Acquisition Corp. v. Universal Foods Corp.,* 877 F.2d 496, 502–05 (7th Cir.1989) (tender offers); *Air Line Pilots Ass'n v. UAL Corp.,* 874 F.2d 439, 446–47 (7th Cir. 1989) (interaction of labor and corporate law). In each case one could have said that the federal rules established the "right" amount of regulation, and that to do more or to do it differently necessarily contradicted the federal judgment. In each case the court rejected the premise of the argument—that the limited extent of the existing federal rule necessarily implies that the federal government has determined that something more, or something different, is a bad thing. To the contrary, federal courts rarely infer preemption of "state law in areas traditionally regulated by the States", *ARC America Corp.,* 109 S.Ct. at 1665, a category that includes occupational licensing. States have been regulating entry into occupations since colonial days.

The two arguments the court does give (beside the drumbeat that § 18 is "clear") are weaker than the argument from negative implication. One is that every other court that has considered this question has understood § 18 to preempt state law. This is not a reason why § 18 *does* preempt state law. A desire to preserve harmony among the inferior federal courts means that we need a good reason to act differently; yet we are rejecting every other court's *approach* to preemption under OSHA and creating a novel test, so uniformity is not dispositive today. The other, and final, reason is that the conference committee eliminated a provision that would have permitted states to create rules stricter than the Department of Labor's (918 F.2d at 677). The details of this episode show that it will not bear the weight my colleagues evidently assign to it.

What is now § 18(h) of OSHA is a transition provision, allowing states to use their own rules without hindrance during the first two years of OSHA's existence. The Senate's version of the transition rule, then § 17(h), read this way:

> Pending approval of a plan submitted by a State under subsection (b) of this section, the Secretary may enter into an agreement with such State under which the State will be permitted to continue to enforce one or more occupational health and safety standards in effect in such State which are not in conflict with Federal occupational health and safety standards promulgated under this Act until final action is taken by the Secretary with respect to the plan submitted by the State, or two years from the date of enactment of this Act, whichever is earli-

er. Except as otherwise provided in this section, any State occupational health and safety standard which provides for more stringent health and safety regulations than do the Federal standards promulgated under this Act shall not thereby be considered to be in conflict with such Federal standards.

116 Cong.Rec. 37637 (Nov. 17, 1970). The first sentence limited state plans to those "not in conflict with" federal rules; the second sentence said that more stringent rules do not conflict. The upshot was that states could use their own standards pending approval by the Secretary only if they were "more stringent" than the federal rules.

As it came out of the conference committee, § 18(h) read so:

The Secretary may enter into an agreement with a State under which the State will be permitted to continue to enforce one or more occupational health and safety standards in effect in such State until final action is taken by the Secretary with respect to a plan submitted by a State under subsection (b) of this section, or two years from December 29, 1970, whichever is earlier.

29 U.S.C. § 667(h). This means that the state may use its own rules during the transitional period, even if they are not as stringent as the federal rules.

Restored to its context, however, the deletion of the Senate's language does not bear on our problem. The Senate wanted to limit the automatic application of state rules during the transition period to those more stringent than the federal rules; Congress as a whole allowed even less stringent state rules to govern during the two-year transition, provided the Secretary approved. Section 18(c), dealing with final approval of plans, reinforces this. Final state plans may differ from federal ones, omitting portions of the federal rules, so long as they are on balance as "effective", § 18(c)(2). Thus the deletion of the Senate language on transitions does not imply that state rules *adding* to permanent federal rules are preempted.

What about the other side? What may be said for the possibility that Illinois is free to add to federal requirements?

- Preventing state augmentation of federal rules is not logically essential to the success of the federal project. Conflicting state rules that hinder accomplishment of the federal objectives are preempted. We need not condemn all in order to avert conflict.

- Overlapping state and federal jurisdiction is the norm, so silent or ambiguous laws ordinarily are understood to allow state regulation—especially when the state deploys "traditional" regulation, such as occupational licensing.

- Overlapping state and federal regulation of safety in the workplace, in particular, is the norm. State workers' compensation laws require employers to pay money on account of accidents caused by hazards covered by OSHA. State structural work acts regulate the construction of scaffolds in detail, and prescribe remedies, although OSHA covers much of the same ground. The "general duty clause" of the Secretary's regulations says, in essence, "create no needless hazards." If this regulation and the many other consensus standards that the Secretary promulgated preempt state law under § 18(b), many traditional areas of state regulation vanish.

- Legislative history treats § 18(b) as a device for states to replace federal rules, not as a ban on state rules supplementing federal ones. For example, the Senate report describes § 18(b) as a provision that "whenever a State wishes to assume responsibility for developing or enforcing standards in an area where standards have been promulgated under this act, the State may do so under a State plan approved by the Secretary of Labor.... [I]ndustries or hazards not covered by the plan will continue to be under Federal jurisdiction." S.Rep. No. 91–1282, 91st Cong., 2d Sess. 18 (1970). Nothing in any of the reports describes § 18 as a provision preempting state law.

My colleagues reply to the third of these by concluding that rules established by tort and criminal law cannot be "standards" for purposes of OSHA, pointing to § 4(b)(4) and collecting the many cases holding that OSHA does not preempt state tort or criminal law, 918 F.2d at 679–80 & n. 9. The reply would be more comforting had not other federal courts concluded that rules of tort law *are* "standards" for purposes of federal auto safety law, so that states may not conclude that cars lacking passive restraints are tortiously designed, despite a savings clause, 15 U.S.C. § 1397(c), more powerful than § 4(b)(4) of OSHA. *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir.1988); *Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989); *Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3d Cir.1990). If tort rules are auto safety "standards"—on the theory that damages may be as potent as administrative rules in inducing firms to alter their behavior—why can't tort rules be employment safety "standards"? If the airbag cases are right, the cases collected in the court's footnote 9 are problematic.

I cannot join an opinion that shortstops the inquiry by calling § 18 "clear" or by relying on the deletion of the Senate's proposed transition rule. I refrain from dissenting only because I find the arguments closely balanced. The collective judgment of many other courts finding a negative implication in the combination of § 4(b)(4) and § 18 leads me to hesitate. On one issue, though, I am persuaded: If § 18 has a negative implication, then preemption depends on the effects of the state law rather than the intent or primary purpose of the state lawmakers.

Application of this test is not so straightforward as the court implies, however. The court treats the 4,000–hour rule as one that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety." 918 F.2d at 679. Yet the plaintiff trade association insists that the law does *not* promote occupational safety, that it is nothing but interest-group legislation designed to reduce the number of licensed heavy equipment operators and thus drive up their wages. See Jeffrey M.

Perloff, *The Impact of Licensing Laws on Wage Changes in the Construction Industry*, 23 J.L. & Econ. 409 (1980). See also Ann P. Bartel & Lacy Glen Thomas, *Predation through Regulation: The Wage and Profit Effects of the Occupational Safety and Health Administration and the Environmental Protection Agency*, 30 J.L. & Econ. 239 (1987); Morris M. Kleiner, Robert S. Gay & Karen Green, *Barriers to Labor Migration: The Case of Occupational Licensing*, 21 Industrial Relations 383 (1982); Alex Maurizi, *The Impact of Regulation on Quality: The Case of California Contractors*, in *Occupational Licensure and Regulation* 26 (Simon Rottenberg ed. 1980).

Although expertise increases with experience, the learning curve flattens out sooner or later. Does that time come sooner (400 hours?) or later (4,000)? Nothing in the record or the legislative debates so much as hints that experience past 400 or even 40 hours has a measurable effect on safety. Suppose Illinois had enacted this law: "Heavy equipment operators dealing with hazardous wastes shall be paid $5.00 more per hour than the market wage of operators of identical equipment in other lines of business." This statute could not be thought preempted by OSHA, yet for all we know it is identical in effect to the statutes Illinois enacted.

Illinois does not defend its statutes by insisting that they are unrelated to industrial safety. Preambles trumpet that the laws "promote job safety", Ill.Rev.Stat. ch. 111 ¶¶ 7702, 7802. Very well. If Illinois chooses to dress up what looks to be an interest-group deal in public-interest clothing, it cannot rely on judicial x-ray vision. The preambles to the state laws *are* "clear", quite unlike § 18 of OSHA. Taking Illinois at its word leads to the conclusion that the laws are preempted, if as my colleagues believe § 18 preempts state laws that regulate health and safety on the job.