STEPHEN CHADWICK *vs.* BOARD OF REGISTRATION IN
DENTISTRY.

Suffolk. September 6, 2011. - December 8, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Constitutional Law,* Supremacy of Federal law, Federal preemption. *Occupa-
tional Safety and Health Administration. Statute,* Federal preemption.
*Regulation. Centers for Disease Control and Prevention. Board of Registra-
tion in Dentistry. Dentist. License. Administrative Law,* Substantial evidence.

This court concluded that while the Board of Registration in Dentistry (board)
may mandate compliance with Occupational Safety and Health Administra-
tion (OSHA) standards in dental practices and sanction dentists for profes-
sional misconduct after OSHA has determined that a violation has oc-
curred, the board may not interpret, apply, and enforce OSHA standards
regarding workplace safety on its own accord [84-90]; further, the preemp-
tive effect of the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et
seq., also bars the board from sanctioning a dentist based on conduct it
finds to be violative of guidelines and regulations of the Centers for
Disease Control and Prevention, where such action constitutes the direct
and substantial regulation of occupational safety and health issues for
which Federal OSHA standards are in effect, notwithstanding the board's
broad powers to define the contours of appropriate conduct for profes-
sional dentists under its jurisdiction [90-96].

The record of a disciplinary proceeding before the Board of Registration in
Dentistry (board) contained credible and substantial evidence supporting the
board's findings concerning a dentist's deficient spore testing practices.
[96-99]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on December 22, 2009.

The case was reported by *Gants,* J.

*Joel Rosen* for the plaintiff.

*Amy Spector,* Assistant Attorney General, for the defendant.

*Natalina A. Servizio,* pro se, amicus curiae, submitted a brief.

CORDY, J. This is an action for judicial review of a final deci-
sion and order of the Board of Registration in Dentistry (board)
suspending Stephen Chadwick's license to practice dentistry in

Massachusetts. Pursuant to G. L. c. 112, § 64, Chadwick filed his appeal with the Supreme Judicial Court for Suffolk County. A single justice reserved and reported the case to the full court.

In its decision, the board found that Chadwick failed to comply with Occupational Safety and Health Administration (OSHA) standards; Centers for Disease Control and Prevention (CDC) guidelines; and Department of Public Health (department) regulations "with respect to spore testing, annual office training, the proper handling and disposal of medical waste, proper maintenance and disposal of sharps [i.e., sharp items, such as needles, scalers, burs, laboratory knives, and wires], the maintenance of complete and accurate records with respect to hepatitis B inoculations, and basic exposure control protocols." The board concluded that this conduct "constitute[d] deceit, malpractice and gross misconduct in the practice of the profession in violation of G. L. c. 112, § 61," and "seriously undermine[d] the integrity of the profession of dentistry and the public's confidence in the practice of dentistry." It suspended Chadwick's license to practice dentistry in Massachusetts for six months and imposed a five-year probationary period to follow the suspension.[1]

Chadwick raises two issues on appeal: whether a State licensing board is preempted from interpreting, applying, and enforcing OSHA standards when disciplining a professional under its authority; and whether the board's decision was supported by substantial evidence. Because we agree that the United States Supreme Court's decision in *Gade* v. *National Solid Wastes Mgt. Ass'n*, 505 U.S. 88 (1992) (*Gade*), applies to this disciplinary proceeding, we conclude that, while the board may mandate compliance with OSHA standards in dental practices and sanction dentists for professional misconduct after OSHA has determined a violation has occurred, the board may not interpret, apply, and enforce OSHA standards regarding workplace safety on its own accord. We further conclude that the preemptive effect of the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. (2006) (act), articulated in *Gade* also bars the board from sanctioning Chadwick based on conduct it finds to be violative of CDC guidelines and department regulations,

---

[1]Stephen Chadwick moved for a stay of the suspension pending this appeal. The single justice denied his request on January 28, 2010.

where such action constitutes the direct and substantial regulation of occupational safety and health issues for which Federal OSHA standards are in effect.

With respect to Chadwick's second contention, we conclude that the board's one finding unrelated to a formal OSHA standard — that pertaining to Chadwick's spore testing practices — is supported by substantial evidence. Therefore, we vacate those portions of the board's decision regarding hepatitis B vaccination training and record-keeping, annual office training for employees, the maintenance of an exposure control program and the handling and disposal of sharps and medical waste, and affirm the board's finding regarding Chadwick's failure to conduct weekly spore testing and record the results. We remand the matter to the single justice who will remand the decision to the board for a reassessment of the penalty imposed.

1. *Background.* On July 10, 1981, the board issued Chadwick a license to practice dentistry. In November, 2003, and April, 2004, the board received two complaints from patients under Chadwick's care. It dispatched compliance officers to inspect Chadwick's offices on July 19, 2004, September 27, 2004, and May 11, 2005. Those inspections revealed a number of deficiencies beyond the ones alleged in the patient complaints.

On May 13, 2005, the board directed Chadwick to show cause why his license should not be revoked or suspended pursuant to G. L. c. 112, § 61. Chadwick filed his answer and request for a hearing on June 1, 2005. An administrative hearings counsel conducted a formal adjudicatory hearing over six days between July, 2006, and April, 2007. Chadwick appeared at the hearing and was represented by counsel. After reviewing the parties' posthearing briefs and Chadwick's objections to a tentative order, the board issued its final decision and order on November 24, 2009.

The board dismissed the allegations against Chadwick pertaining to the patient complaints because they lacked evidentiary support.[2] It nonetheless found that Chadwick failed to comply with proper infection control procedures in violation of 234

---

[2]Because the board decided to address the major deficiencies reported after the various inspections at Chadwick's office, it refrained from considering his reported failure to post certain certificates. It also declined to address his reported failures to maintain a complete emergency drug kit or certificates of

Code Mass. Regs. § 2.04(18) (1995). This provision mandates that "[a]ll persons licensed by the Board and all offices providing dental services shall be required to provide services in compliance with the 'Recommended Infection-Control Practices for Dentistry, 1993' published by the [CDC] . . . as the same may be amended and republished by the CDC."[3,4] These guidelines, in turn, recommend that the CDC program "be followed in addition to practices and procedures for worker protection required by [OSHA] standards for occupational exposure to bloodborne pathogens."[5] Guidelines for Infection Control in Dental Health-Care Settings — 2003, 52 MMWR Recommendations and Rep. No. RR-17 at 5 (2003) (CDC guidelines). OSHA's blood-borne pathogens standards are generally designed to minimize the occupational exposure of health-care personnel and specifically require, among other things, that employers "implement workplace controls, provide post-exposure vaccination or prophylactics and provide education programs to every exposed employee." Note, The Occupational Safety and Health Administration's Bloodborne Pathogen Standard: An Important First Step Toward

receipt indicating that he had contracted for the proper disposal of medical waste because there was no testimony or evidence presented that any regulations governed that conduct.

[3]The "Recommended Infection-Control Practices for Dentistry, 1993" were amended and republished as the "Guidelines for Infection Control in Dental Health-Care Settings — 2003." 52 MMWR Recommendations and Rep. No. RR-17 at 5 (2003). The Board of Registration in Dentistry (board) relied on the 2003 document throughout its opinion and referred to it as "the [Centers for Disease Control (CDC)] guidelines." We do the same.

[4]Chadwick argues that the board inappropriately cited him for not complying with CDC guidelines that were "recommended" rather than "required." Section 2.04(18) of 234 Code Mass. Regs. (1995), however, mandates compliance with the CDC guidelines, without differentiating between the two categories. This fact — coupled with the board's established power to adopt rules through adjudication — persuades us that the board could properly hold Chadwick to both recommended and required guidelines. See *Anusavice* v. *Board of Registration in Dentistry*, 451 Mass. 786, 794-795 (2008). The board's use of the CDC guidelines must, however, be consistent with the remainder of this decision.

[5]The board has since amended its regulations to require explicitly compliance with both the CDC guidelines and the Occupational Health and Safety Administration (OSHA) blood-borne pathogens standard, and to render any noncompliance grounds for discipline. See 234 Code Mass. Regs. § 5.05 (2010); 234 Code Mass. Regs. § 9.05(3) (2010).

Protecting Employees from the Risks of Occupational Exposure, 17 Seton Hall Legis. J. 541, 542 (1993).

Relying on the CDC guidelines, OSHA standards and department waste regulations, the board reviewed the evidence and found the following six deficiencies in Chadwick's dental practice.

First, it determined that Chadwick failed to provide training for his employees prior to offering them the hepatitis B vaccination, failed to maintain records of the employees' receiving or declining the vaccination, and failed to complete the OSHA-mandated declination form for his own vaccination. According to the board, these failures violated OSHA standards that mandated training and record-keeping for hepatitis B vaccinations,[6,7] and CDC guidelines recommending that employers maintain a written policy regarding staff immunizations, as well as confidential medical records to document those immunizations.[8] The board also noted that in Matter of Abrahamson, Board of Registration in Dentistry Nos. DN-02-225, DN-02-255, DN-03-058, DN-04-083, DN-05-025 (July 27, 2007) (final decision and order) (Abrahamson), it had previously found that "a dentist's failure to comply with CDC guidelines relative to the vaccination of dental staff and documentation thereof is a violation of [234 Code Mass. Regs. § 2.04(18)] and constitutes gross misconduct in the practice of the profession of dentistry."[9]

Second, the board concluded that Chadwick's monthly office training on infection control did not comport with CDC guidelines or OSHA standards, and that Chadwick failed to conduct and document annual office training. To the board, these deficiencies violated a CDC recommendation that employers provide training on occupational exposure to infectious agents and infection control procedures to employees on initial employment, assignment to tasks with occupational exposure or, at a minimum, annually,[10] and an OSHA standard that requires all employees

---

[6]See 29 C.F.R. § 1910.1030(f)(2)(i) (2009); 29 C.F.R § 1910.1030(g)(2)(vii) (2009).

[7]See 29 C.F.R. § 1910.1030(h)(1)(i), (ii), (iv) (2009); 29 C.F.R. § 1910.1030 (f)(2)(iv) (2009).

[8]See CDC Guidelines I(C)(1) and I(F).

[9]It is undisputed that Chadwick and his employees with occupational exposure either received a hepatitis B vaccination or declined that vaccination.

[10]See CDC Guideline I(B)(1).

with occupational exposure to participate in a comprehensive training program on blood-borne pathogens and infection control on assignment to new tasks with occupational exposure and at least annually.[11] The OSHA standards further require that employers maintain records of these training sessions.[12]

Third, the board concluded that Chadwick did not develop or maintain an adequate "exposure control plan" accessible to his employees, contrary to an OSHA standard that requires employers to establish and make accessible to their employees a written plan detailing, among other things, exposure determinations and procedures for evaluating exposure incidents,[13] and CDC recommendations that employers develop a written health program regarding immunizations, exposure prevention and postexposure management.[14] The board again referenced its Abrahamson decision, in which it had "asserted that CDC guidelines and OSHA regulations direct each dental office to maintain a written program or manual that sets forth infection control policies."

Fourth, the board concluded that, prior to March, 2005, Chadwick failed to conduct and record weekly spore testing, which is a method of sterilizing dental instruments and ensuring that the sterilizer is working properly.[15] This failure violated CDC recommendations that an employer use biological indicators at least weekly to monitor sterilizers and maintain sterilization records in compliance with State and local regulations.[16] The board did not rely on an OSHA standard to fault Chadwick for this failure, but did explicitly concur with its own decision in Abrahamson that "spore testing must be conducted at a minimum on a weekly basis and records must be maintained that reflect the outcome and dates of spore testing."

---

[11]See 29 C.F.R. § 1910.1030(g)(2)(i), (iii), (vi)-(viii) (2009).

[12]See 29 C.F.R. § 1910.1030(h)(2) (2009).

[13]See 29 C.F.R. § 1910.1030(c)(1)(i)-(iii) (2009).

[14]See CDC Guidelines I(A)(1) and I(D).

[15]"Spore testing" involves placing a test strip (or vial) containing spore bacteria in a sterilizer, removing the test strip and allowing it to incubate, and then comparing the results to those for a "control" strip containing the same bacteria but that is not placed in the sterilizer.

[16]See CDC Guidelines VI(A)(2)-(3); CDC Guidelines VI(D)(1)-(2); CDC Guidelines VI(F)(1), (6), (10).

Fifth, the board cited Chadwick for his practices concerning glass carpules, small cylindrical glass tubes containing dental anesthetics that are screwed onto syringes and used to administer medication. Specifically, it determined that Chadwick removed rubber stoppers from glass carpules and sterilized glass carpules in an autoclaver before disposing of them "in the town trash." To the board, these practices violated OSHA standards[17] and CDC guidelines[18] providing that sharps be discarded in labeled containers that meet certain criteria, "particularly as those guidelines and standards seek to encourage the safe handling of sharps and the prevention of exposure to contaminated sharps." The board also invoked a department waste regulation, which requires that containers of sharps either be incinerated at approved facilities or rendered noninfectious and processed "to eliminate the physical hazard of the sharps" before being disposed of in a sanitary landfill.[19]

Last, the board faulted Chadwick for his practice of soaking cotton balls and gauze dotted with blood in an unlabeled container of bleach before disposing of them. The board determined that these items constituted medical waste and that Chadwick threw them into the town trash. It then concluded that this practice violated CDC guidelines recommending that employers use "a color-coded or labeled container to contain non-sharp regulated medical waste,"[20] and OSHA standards requiring that "[s]pecimens of blood" and regulated waste be placed in containers that are leakproof, color coded and labeled.[21] Relying on testimony from the prosecuting counsel's expert witness, the board further concluded that OSHA requires that any methods for decontaminating medical waste include a written program, something Chadwick did not have,[22] and that Chadwick's failures also

---

[17]See 29 C.F.R. § 1910.1030(d)(2)(vii)(A), (viii) (2009); 29 C.F.R. § 1910.1030(d)(4)(iii)(A)(1) (2009).

[18]See CDC Guidelines II(B)(2)(b), (c); CDC Guidelines VII(F)(2)(b).

[19]See 105 Code Mass. Regs. § 480.200(B) (1997).

[20]See CDC Guideline VII(F)(1)(b), (F)(2)(a). The board also referenced the CDC guidelines regarding sharps in its findings on Chadwick's medical waste practices. See CDC Guideline II(B)(1)(b), (B)(2)(b), (B)(2)(c).

[21]See 29 C.F.R. § 1910.1030(d)(2)(xiii); 29 C.F.R. § 1910.1030(d)(4)(iii)(B)(1), (C) (2009).

[22]The expert's testimony derived from the OSHA standards at 29 C.F.R. § 1910.1030(e)(2)(i) and 29 C.F.R. § 1910.1030(d)(4)(i).

violated department waste regulations mandating that "[b]lood saturated materials" either be incinerated or rendered noninfectious on site before disposal at a sanitary landfill, that any waste rendered noninfectious before transport be labeled, and that any procedures for rendering waste noninfectious be written.[23]

2. *Preemption.* "Under the supremacy clause in art. 6 of the Constitution of the United States, we are obligated to declare invalid any State statute or regulation that purports to regulate a field that Congress has reserved exclusively to itself." *Commonwealth* v. *College Pro Painters (U.S.) Ltd.*, 418 Mass. 726, 728 (1994). The "ultimate touchstone" of preemption is congressional intent, which courts discern through "the explicit statutory language and the structure and purpose of the statute." *Gade, supra* at 96, quoting *Ingersoll-Rand Co.* v. *McClendon*, 498 U.S. 133, 138 (1990), and *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 208 (1985).

As the Supreme Court explained in *Gade*, Congress had two intentions in promulgating the act. First, Congress explicitly sought "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). To that end, Congress established a regime in which the Secretary of Labor may "set mandatory occupational safety and health standards," such as the blood-borne pathogen standards on which the board relied in this case. *Gade, supra* at 96, citing 29 U.S.C. § 651(b)(3). It also authorized the Secretary of Labor to enforce these standards through on-site inspections and investigations, 29 U.S.C. § 657, and to impose civil and criminal penalties on employers found to violate them. 29 U.S.C. § 666.

Through the act, Congress permitted the Federal government to enter the field of workplace safety, "a field that traditionally had been occupied by the States." *Gade, supra.* This entry, however, was not "uniform or comprehensive" because the act reserved for the States particular avenues of involvement. *Lindsey* v. *Caterpillar, Inc.*, 480 F.3d 202, 206 (3d Cir. 2007). The act permits the States to assert jurisdiction "under State law over any occupational safety or health issue with respect to which no

---

[23]See 105 Code Mass. Regs. § 480.020(A) (2008); 105 Code Mass. Regs. § 480.200(C) (2008); 105 Code Mass. Regs. § 480.300(C) (2008); 105 Code Mass. Regs. § 480.400(A) (2008).

[Federal] standard is in effect," 29 U.S.C. § 667(a), and sets forth a "savings clause," which provides that the act does not "supersede or in any manner affect any workmen's compensation law or . . . enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment."[24] 29 U.S.C. § 653(b)(4).

The act also provides a mechanism through which States can supplant Federal occupational safety and health standards. A State may submit to OSHA a "state plan" with proposed State standards. 29 U.S.C. § 667(b). "If the state plan is approved by OSHA, the standards in the state plan displace applicable federal standards . . . [The act] and the regulations promulgated thereunder provide for implementation, oversight, and modification of these state plans" (citations omitted). *Industrial Truck Ass'n v. Henry*, 125 F.3d 1305, 1307 (9th Cir. 1997).[25]

Given the interplay of the act's provisions, a plurality of the Court in *Gade*, *supra* at 100, concluded that Congress also sought "to avoid subjecting workers and employers to duplicative regulation." It determined that Congress had "established a system of uniform federal occupational health and safety standards, but gave States the option of preempting Federal regulations by developing their own occupational safety and health programs." *Gade*, *supra* at 102. Where a State does not exert that option, the act "precludes any state regulation of an occupational safety or health issue with respect to which a federal standard has been established."[26] *Id.* See *Commonwealth*

---

[24]State courts have cited this clause in concluding that State tort laws and State criminal prosecutions involving workplace injuries are not preempted. See, e.g., *People* v. *Chicago Magnet Wire Corp.*, 126 Ill. 2d 356, 366 (1989) (allowing State criminal prosecution for conduct governed by act); *Irwin* v. *St. Joseph's Intercommunity Hosp.*, 236 A.D.2d 123, 130 (N.Y. 1997) (allowing State tort claim based on workplace injury).

[25]As noted *infra* at 87, Massachusetts has not submitted a State plan to OSHA.

[26]Prior to the decision in *Gade* v. *National Solid Wastes Mgt. Ass'n*, 505 U.S. 88 (1992) (*Gade*), every Federal and State court confronted with a State law or regulation that established an occupational health and safety standard on an issue for which OSHA had already promulgated a standard found the law or regulation to be preempted by the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. (2006) (act). *Id.* at 97-98 & n.1.

v. *College Pro Painters (U.S.) Ltd., supra*; Massachusetts Elec. Co. *vs.* Reilly, Suffolk Superior Court No. SUCV-2004-04133 (Aug. 29, 2005).

A plurality of the *Gade* Court characterized the scope of the act's preemption as implied conflict preemption, writing that "nonapproved state regulation of occupational safety and health issues for which a federal standard is in effect is impliedly preempted as in conflict with the full purposes and objectives of the . . . Act." *Gade, supra* at 98-99. Justice Kennedy, concurring in the result, found "express preemption." *Gade, supra* at 114 (Kennedy, J., concurring in part and concurring in the judgment). As the plurality of the Court explained in a footnote, this distinction carried little meaning: "Our disagreement with Justice Kennedy as to whether the . . . Act's pre-emptive effect is labeled 'express' or 'implied' is less important than our agreement that the implications of the text of the statute evince a congressional intent to pre-empt nonapproved state regulations when a federal standard is in effect." *Id.* at 104 n.2.

While this general pronouncement of preemption alone would reach and bar much of the board's action against Chadwick, the Supreme Court extended its analysis to two types of State regulation applicable to the case before us. First, it concluded that the act's preemptive effect reaches nonconflicting State laws that share the Federal government's goal of promoting worker safety, where they "interfere[] with the methods by which the federal statute was designed to reach th[at] goal." *Gade, supra* at 103, quoting *International Paper Co.* v. *Ouellette,* 479 U.S. 481, 494 (1987). To the Court, the methods of the act are clear: "If a State wishes to regulate an issue of worker safety for which a federal standard is in effect, its only option is to obtain the prior approval of the Secretary of Labor, as described in [§ 667] of the Act." *Gade, supra* at 103-104. " '[C]oncurrent' state and federal jurisdiction 'in areas where [OSHA] issues a standard' " is not permitted. *Industrial Truck Ass'n* v. *Henry, supra* at 1310. See *Gade, supra* at 113 (Kennedy, J., concurring in part and concurring in the judgment) ("concurrent state and federal jurisdiction might interfere with the enforcement of the federal regulations without creating a situation where compliance with both schemes is a physical impossibility").

Second, the Court considered the applicability of the act's preemptive effect on dual-impact regulations, which "articulate[] a purpose other than (or in addition to) workplace health and safety." *Gade, supra* at 105. Expressing concern that States may obviate the purpose of § 667 "simply by asserting a non-occupational purpose of the legislation," the Court shifted its focus from the purpose of the regulation to its effect. *Gade, supra* at 106, 107, quoting *National Solid Wastes Mgt. Ass'n* v. *Killian*, 918 F.2d 671, 679 (7th Cir. 1990) (*Killian*) ("The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed preempted under the Act"). In doing so, the Court adopted the following standard: "[I]n the absence of the approval of the Secretary, the [Act] pre-empts all state law that 'constitutes in a direct, clear and substantial way, regulation of worker health and safety.' " *Gade, supra* at 107, quoting *Killian, supra.* It differentiated these preempted regulations from "state laws of general applicability (such as laws regarding traffic safety or fire safety) that do not conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike." *Gade, supra.* Such generally applicable laws typically would not be preempted. *Id.*

Because Massachusetts has not adopted an approved State plan pursuant to § 667(b), Federal OSHA standards — and the Federal regulatory scheme envisioned under the act — control in the Commonwealth. Given the existence of these Federal standards and the Federal mechanisms for their interpretation and application, the board's decision regarding Chadwick's violation of them conflicts with the "full purposes and objectives" of the act in two ways. *Gade, supra* at 99. First, it represents State interpretation, application, and enforcement of OSHA standards, constituting an improper assertion of concurrent jurisdiction. Second, it represents direct and substantial State regulation of occupational safety and health issues for which Federal OSHA standards are in effect. We consider each issue in turn.

a. *Interpretation of OSHA standards.* The board argues that, in referencing OSHA standards, it was not "enforcing" those standards, but "merely adopting those standards (in identical form) to establish a state law standard of conduct for Massachusetts dentists." This contention is untenable.

For each of the five relevant findings — those regarding hepatitis B vaccination training and record-keeping, office training, exposure control programs, and the handling and disposal of sharps and medical waste — the board identified an OSHA standard or standards on point. It set out the text of those standards and, bolstered by expert testimony and evidence taken at the hearing, judged Chadwick's practices against them. In some respects, the board's conclusions regarding the OSHA standards appear to comport with the plain meaning of the standards.[27] In other respects, the board's conclusions may be at variance with OSHA's own interpretation of its standards.[28]

The focus of our inquiry, however, does not require us to decide whether the board correctly interpreted these OSHA standards. Our point in referencing the potential misinterpretation is to show

[27]The board's application of the OSHA standards regarding training and recording of hepatitis B vaccinations, office training, and exposure control programs engages a straightforward reading of OSHA's training and record-keeping requirements.

However, there is a question whether the board properly cited Chadwick for not using the OSHA-mandated declination form to record his own hepatitis B vaccination status. According to Kathy Eklund, the board's expert witness, whether Chadwick's practice was a sole proprietorship or a corporation would dictate whether he had to complete the form. The board did not address this discrepancy in its findings, and it is not apparent from the record whether Chadwick had incorporated his practice.

[28]The board's application of the OSHA standards regarding the handling and disposal of sharps and medical waste required the threshold determination that unbroken glass carpules and cotton balls and gauze "dotted with blood" qualified as sharps and medical waste, respectively. Chadwick presents a persuasive argument, based on the statutory definitions of "sharps" and "regulated waste" and two Standard Interpretations issued by OSHA on May 28, 1992, and January 9, 2007, that OSHA itself would not consider the unbroken glass carpules "sharps" or the cotton balls and gauze "regulated waste."

With regard to sharps, the board argues that a latter portion of the 2007 Standard Interpretation acknowledges that the "ultimate disposal of pharmaceutical vials must be in accordance with municipal, state and federal regulations . . . OSHA does not regulate the disposal of medical wastes which are not 'regulated waste' within the meaning of the bloodborne pathogens standard." The board then contends that it was free to develop its own regulations regarding carpules as nonregulated waste. The board, however, was not creating its own regulations in this instance. It was interpreting the "sharps" provision of the OSHA blood-borne pathogens standard, ultimately finding that Chadwick "failed to handle, store, maintain or dispose of sharps in a manner consistent with CDC guidelines, OSHA standards, or [department] Waste Regulations" (emphasis added).

that, in invoking the OSHA standards, the board necessarily interpreted, applied, and enforced them. In doing so, the board exposed Chadwick to the exact danger Congress sought to avoid through the act: that the State would "subject[] workers and employers to duplicative regulation." *Gade, supra* at 100.

As outlined above, to avoid this redundancy, Congress established a regime in which the Federal government maintains, or a State assumes through a statutorily prescribed process, responsibility for occupational safety and health issues. Where Massachusetts has not assumed that responsibility, the Federal government retains its authority over the creation, interpretation and enforcement of such standards in the Commonwealth. See *Cuyahoga Valley Ry.* v. *United Transp. Union*, 474 U.S. 3, 6-7 (1985) (detailed statutory scheme of act contemplates that rights created under and enforcement of act are sole responsibility of Secretary of Labor). Consequently, the States' powers are limited to regulating those areas designated by the savings clause and those occupational safety and health issues for which no Federal OSHA standard is in effect.

The board's use of OSHA standards in its disciplinary proceeding falls outside these limited powers. Where Congress intended for a single set of regulations to exist, the board, in effect, created two: the standards OSHA promulgates and the board's interpretation of those standards. And, where Congress designated an approved State plan as the sole method of State involvement where Federal OSHA standards exist, the board asserted itself as an enforcement mechanism in the absence of such a plan. The board's decision, then, must be preempted as "interfer[ing] with the methods by which the federal statute was designed to reach [its] goal." *Gade, supra* at 103. The board cannot refashion this underlying action as a State law "standard of conduct" to avoid this result.

Although we hold that the board itself may not interpret or enforce OSHA standards, we do not read the text of the act or the language of *Gade* as prohibiting the board from mandating compliance with OSHA standards in a dental practice and subsequently sanctioning a dentist as a result of violations identified by OSHA. In such circumstances, the authority to interpret and apply OSHA standards would be reserved to the Federal government, and any disciplinary action that the board may take

to preserve the integrity of the profession and public confidence in the practice of dentistry would not interfere with the "full purposes and objectives" of the act so as to trigger its preemptive effect. *Id.* at 99.

b. *Direct and substantial regulation.* The language of *Gade* further compels us to examine the validity of the board's reliance on the CDC guidelines and department waste regulations in light of these OSHA standards. This is because the act's preemptive effect extends not only to a State's interpretation, application, and enforcement of the OSHA standards themselves, but also to any State law that directly, specifically, and substantially regulates an occupational safety and health issue for which a Federal OSHA standard is in effect.[29] See *id.* at 107. Although the Court articulated this rule in the context of dual impact regulations (where part of a State's purpose is to promote worker safety), it emphasized the predominant role in the preemption analysis of the regulation's *effect*. See *id.* ("Whatever the purpose or purposes of the state law, pre-emption analysis cannot ignore the effect of the challenged state action on the pre-empted field"). See also CF & I Steel, L.P. *vs.* Bay Area Rapid Transit Dist., No. C00-00529WHA (N.D. Cal. Sept. 19, 2000), quoting *Gade, supra* (recognizing that OSHA preemption extends to "all state law that 'constitutes, in a direct, clear and substantial way, regulation of worker health and safety,' unless a state has entirely displaced OSHA with its own federally-approved occupational safety and health program"). Therefore, although the board did not purport to regulate worker safety through its disciplinary proceedings against Chadwick, we must consider whether, in invoking the CDC guidelines and department waste regulations, the board reached conduct governed by existing OSHA standards, and whether in regulating that conduct, the board established impermissible "occupational safety and health standard[s]."[30] See *Gade, supra* at 107.

i. *Applicable OSHA standards.* To apply this framework to

---

[29]While the CDC guidelines are not promulgated by the State, their incorporation as requirements in the board's regulation of dentists requires us to consider them as such in this context.

[30]As a preliminary matter, we conclude that the board's disciplinary decision, because it has the effect of regulating Chadwick's conduct, and by extension, the conduct of other dentists, is State regulation sufficient to trigger

the board's decision, we must first determine whether OSHA standards govern the same conduct as the CDC guidelines and department waste regulations invoked by the board. If they do not, the board acted within the State's authority to regulate occupational safety and health issues for which no Federal standard is in effect. 29 U.S.C. § 667(a).

An examination of the authorities used to discipline Chadwick for his deficiencies regarding training and recording of hepatitis B vaccinations, office training, exposure control programs, and the handling and disposal of sharps and medical waste leads us to conclude that the OSHA standards, CDC guidelines, and department waste regulations reach the same conduct and thus invite further preemption analysis.

In finding that Chadwick failed properly to record his employees' and his own hepatitis B vaccination status, the board relied on similar OSHA standards and CDC guidelines. They differ only in that the OSHA standards are specifically geared to hepatitis B vaccinations (the type of vaccinations at issue here), while the CDC guidelines generally recommend that employers develop a comprehensive policy on immunizations and maintain confidential medical records for each employee. Similarly, the board turned to complementary OSHA standards and CDC guidelines to fault Chadwick for not conducting appropriate office training or maintaining an adequate exposure control plan. In the first instance, both sets of regulations address the

OSHA preemption. See, e.g., *Gade, supra* at 93-94 (articulating scope of act's preemption in context of Illinois regulations governing licensing of hazardous waste workers without determining what, if any provisions, are preempted); *Commonwealth* v. *College Pro Painters (U.S.) Ltd.*, 418 Mass. 726, 727 (1994) (preemption where Massachusetts regulation requiring licensing of riggers and posting of rigger's license at work sites reached conduct governed by OSHA standard). The board is statutorily empowered to make "such rules and regulations as it deems necessary," and "may exercise its authority by formal rule making, or may adopt policies by adjudication." *Anusavice* v. *Board of Registration in Dentistry*, 451 Mass. 786, 794 (2008), citing *Hastings* v. *Commissioner of Correction*, 424 Mass. 46, 49 (1997) ("It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rulemaking, . . . and the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency"). The policies contained within the board's final decision against Chadwick, therefore, have precedential value and are sufficient State regulation to come under the auspices of OSHA preemption.

employer's responsibility to provide employees with education and training on infection control on initial employment or assignment to new tasks with occupational exposure and at least annually thereafter; in the second, both describe a written health program, which the employer should make accessible to all employees, that includes policies and procedures for exposure control and postexposure management.

Next, the board's finding that Chadwick failed properly to handle and dispose of sharps and medical waste derived from similar OSHA standards and CDC guidelines, as well as department waste regulations. Both the OSHA standards and CDC guidelines describe the containers that employers must use to store sharps and medical waste and dictate that these containers be appropriately labeled. As noted by the prosecuting counsel's expert, the OSHA standards also permit the decontamination of regulated waste prior to disposal and require that decontamination methods be written. The department waste regulations reach this same conduct, but impose additional requirements. For example, the department waste regulations require that containers of sharps be incinerated at an approved facility, or processed to eliminate the physical hazard prior to disposal at a sanitary landfill. They also require that "[b]lood saturated materials" either be incinerated at an approved facility or rendered noninfectious prior to disposal at a sanitary landfill, so long as the methods of rendering waste noninfectious are written and the noninfectious waste labeled. While the CDC guidelines align with the OSHA standards, the department waste regulations appear to reach conduct beyond them (that is, the treatment of processed sharps and medical waste rendered noninfectious and the disposal of them at an approved incineration facility or sanitary landfill). Although this signals some difference between the conduct proscribed by the OSHA standards and the department waste regulations, it is not clear that the board relied on those differences in making its decision. While the board found that Chadwick had disposed of sharps and medical waste in the town trash, the thrust of its decision focused on Chadwick's practices within his own office. In its specific findings of fact for infection control, the board emphasized Chadwick's practices of removing the rubber stoppers from glass carpules, autoclaving glass carpules, and soaking cotton balls and medical gauze

in bleach, not the allegation that he then deposited these carpules, cotton balls and gauze in the town trash.[31] Therefore, we conclude that, like the CDC guidelines, the substance of the department waste regulations on which the board relied are sufficiently related to issues that the OSHA standards govern to trigger potential preemption under the act. See *Industrial Truck Ass'n v. Henry, supra* at 1310 ("All state regulations relating to the 'issue' of a [OSHA] standard are preempted even if they do not conflict with the federal scheme").

With respect to Chadwick's failure to conduct weekly spore testing and record the results, however, the board invoked only the CDC guidelines and referenced a prior decision of its own. It is not apparent that a formal OSHA standard covering such conduct was in place during the relevant time period.[32,33]

ii. *Direct and substantial effect.* Having concluded that OSHA

[31]We note that the board did not cite the department waste regulations in the "Discussion" portion of its decision.

[32]In Matter of Abrahamson, Board of Registration in Dentistry Nos. DN-02-225, DN-02-255, DN-03-058, DN-04-083, DN-05-025 (July 25, 2007) (final decision and order) (Abrahamson), the board noted that the dentist had been cited by OSHA for not conducting or recording regular spore testing. This appears to have been the product of a 2001 OSHA directive established to clarify inspection practices, in which OSHA drew the need to conduct and record spore testing from the requirement that regulated waste containers be labeled. That is, because decontaminated regulated waste need not be labeled or color coded, a compliance officer "should verify that the employer's exposure control plan states the decontamination procedures to be followed. In order to ensure that the decontamination process is successful, the employer must monitor factors such as the content, volume, density, configuration, and organic content of the load of waste. . . . Autoclave efficiency can be verified by means of biological or chemical indicators." The directive goes on to discuss the documentation that must be kept for sterilizers, such as "the date, time, and operator of each run," as well as the "results of routine spore testing." This language mirrors the conduct governed by the spore testing recommendations of the CDC guidelines. The 2001 directive, however, does not purport to preempt State law and subsequently, in 2004, OSHA issued an interpretation of its blood-borne pathogens standard, acknowledging that there is "no specific OSHA standard on the autoclaving of instruments."

In the same 2004 interpretation, OSHA noted that the CDC has "developed guidelines and recommendations on the use and monitoring of sterilization equipment in dental healthcare settings," further suggesting that OSHA has not developed standards on that issue. Given OSHA's own reading of its blood-borne pathogen standard, and the recognition that a State may "assert jurisdiction . . . over any occupational safety or health issue with respect to which no [Federal] standard is in effect," we refrain from concluding that the

has promulgated relevant standards with regard to five of the six deficiencies identified, we turn to the effect of the board's disciplinary proceeding and consider whether, in using the CDC guidelines and department waste regulations, it created impermissible "occupational safety and health standards." An "occupational safety and health standard" is a "standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8) (2006). Regardless of the purpose underlying the action, "a state law requirement that directly, substantially, and specifically regulates occupational safety and health is an occupational safety and health standard within the meaning of the Act." *Gade, supra* at 107.

Although it did not purport to regulate occupational safety and health issues, the board's decision focused on Chadwick's role as an employer, not a healthcare professional, when it assessed his practices regarding hepatitis B vaccinations and training, office training, exposure control, and the handling and disposal of sharps and medical waste. As such, the board imposed on him methods of practice that are directly, substantially, and specifically aimed at workplace safety; as detailed above, they instruct the dentist, as an employer, to establish safeguards to prevent occupational exposure to his employees.[34] See *Gade, supra* at 107, and *English v. General Elec. Co.*, 496 U.S. 72, 85 (1990) ("for a state law to

preemptive effect of the act applies to the 2001 directive. 29 U.S.C. § 667(a) (2006). See *Chamber of Commerce of the U.S. v. United States Dep't of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999) (directive's failure to preempt State law is "point of difference between it and a formal OSHA standard").

[33]Even if the 2001 directive was construed to constitute a standard with the act's preemptive effect, we doubt that the board's actions regarding spore testing based on CDC guidelines would fail the second half of our preemption analysis. As described *infra*, only State regulation that "directly, substantially, and specifically" regulates workplace safety must give way to a comparable OSHA standard. *Gade, supra* at 107. Though there is some incidental effect on worker safety, we cannot say that practices regarding spore testing are "occupational safety and health standards." Rather, they are public health measures to ensure the proper functioning of sterilization equipment used in the routine practice of dentistry.

[34]Though *Gade* did not elaborate on the meaning of "substantial," other Supreme Court cases have suggested that the inquiry should focus on the cumulative effect of the State law. See *English v. General Elec. Co.*, 496 U.S. 72, 85 (1990); *Wisconsin Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288-289

fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those [at whom the regulation is directed]").

This is not to say that the act preempts the board's use of the CDC guidelines or department waste regulations in their entirety. *Gade* does not require such expansive preemption, but rather "refers to preemption of state regulation on an issue-by-issue basis." *Industrial Truck Ass'n* v. *Henry, supra* at 1311. Only where an OSHA standard exists for a given workplace practice does the question of preemption arise, and only where the State regulation directly or substantially affects workplace safety does preemption attach.[35]

c. *Licensing.* The board's goal in penalizing Chadwick ostensibly was to protect the public health and preserve the integrity of the profession of dentistry, matters in which the State has a compelling interest. See *Gade, supra* at 108 (recognizing State interest "in the practice of professions within [its] boundaries"). As a result, the board has broad powers to define the contours of appropriate conduct for professional dentists under its jurisdiction. G. L. c. 112, §§ 43-53. See *Leigh* v. *Board of Registration in Nursing*, 395 Mass. 670 (1985). See also *Gade, supra* at 107. However, that power does not permit the board independently to interpret and apply OSHA standards or otherwise regulate occupational safety and health issues that Federal OSHA standards govern, where Congress has clearly indicated its intent to confine State authority to occupational safety and health issues for which no Federal OSHA standard exists, unless an approved plan is in place. As the Supreme Court cautioned in *Gade, supra* at 108, quoting *Felder* v. *Casey*, 487 U.S. 131,

---

(1986) ("Each additional statute incrementally diminishes the [National Labor Relation Board's] control over enforcement of the [National Labor Relations Act] and thus further detracts from the 'integrated scheme of regulation' created by Congress").

[35]We recognize the historic interplay of the CDC guidelines and OSHA standards and do not intend for this opinion wholly to disrupt the board's use of the CDC guidelines in setting infection control standards for dentists within Massachusetts. Note, The Occupational Safety and Health Administration's Bloodborne Pathogens Standard: An Important First Step Toward Protecting Employees from the Risks of Occupational Exposure, 17 Seton Hall Legis. J. 541, 542, 544-553 (1993). We are solely concerned with those portions of the CDC guidelines that, like the OSHA standards, have the effect of directly, specifically, and substantially regulating workplace safety.

138 (1988), "under the Supremacy Clause . . . 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' " Therefore, the Court rejected, as this court must, the argument that a "State's interest in licensing various occupations can save from [the act's] pre-emption those provisions that directly and substantially affect workplace safety."[36] *Gade, supra.* See *Wisconsin Bell, Inc.* v. *Bie,* 340 F.3d 441, 447 (7th Cir. 2003) (*Gade* concluded "that OSHA preempted the entire field of parallel state regulation. Therefore, of course, any state law that circumvented the procedure outlined in OSHA would be preempted").

3. *Credible and substantial evidence.* We turn now to the one board finding that does not directly implicate an OSHA standard — Chadwick's practice regarding spore testing. Chadwick argues that this finding is not supported by substantial evidence and relies on faulty credibility determinations.

The standard of review guiding us is clear: "We must uphold the decision of the board where, considering the entire record, its findings are supported by substantial evidence." *D'Amour* v. *Board of Registration in Dentistry,* 409 Mass. 572, 581 (1991), quoting *Langlitz* v. *Board of Registration of Chiropractors,* 396 Mass. 374, 379 (1985). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). This review is quite limited. "While we must consider the entire record, and must take into account whatever in the record detracts from the weight of the [board's] opinion, . . . as long as there is substantial evidence to support the findings of the [board], we will not substitute our views as to the facts." *D'Amour* v. *Board of Registration in Dentistry, supra,* quoting *Cherubino* v. *Board of Registration of Chiropractors,* 403 Mass. 350, 354 (1988). We summarize the board's findings of fact, supplemented by reference to exhibits and testimony presented at the hearing, to the extent necessary for this analysis.

---

[36]For the same reason, we also reject the board's argument that the "presumption against preemption," which typically arises where Congress has legislated in a "field which the States have traditionally occupied," applies to this case. *Medtronic, Inc.* v. *Lohr,* 518 U.S. 470, 485 (1996). As discussed above, there is a clear indication of congressional intent that the act supersede the States' historic powers over occupational safety and health. See *Gade, supra* at 108.

On July 19, 2004, Kathy Perault and Sarah Millar, two of the board's compliance officers, conducted an inspection of Chadwick's office.[37] At some point during the inspection, Chadwick told Perault that he had not been performing spore testing. Perault testified to this exchange at the hearing and the report of the inspection (admitted in evidence) indicates that deficiency.

At the hearing, Chadwick testified that he had been responsible for spore testing until the July, 2004, inspection, at which point he assigned the task to his dental assistant, Andrea Summerton. He, Summerton, and another employee, Wendy Jolie, specifically refuted Perault's testimony that Chadwick had told her he did not conduct spore testing. Rather, the three claimed, spore testing occurred every week, and Summerton further testified that she would purchase the supplies as needed. Chadwick, however, was unable to produce documents verifying the results for any tests performed before the first inspection. Further, although Summerton had begun keeping written records when she assumed responsibility for spore testing after the July, 2004, inspection, several gaps existed in the records between November 1, 2004, and March 1, 2005.[38]

Both parties also offered expert testimony at the hearing. Kathy Eklund, for the board, opined that "there was no evidence from which she could conclude that [Chadwick] conducted routine and regular spore testing of the sterilizer" or that he maintained documentation of the testing dates and results, as recommended by the CDC guidelines. In contrast, Dr. John D. Da Silva, Chadwick's expert, testified that Chadwick's spore testing program complied with the CDC guidelines, which he read as not requiring the maintenance of written records.[39]

In considering this evidence, the board explicitly concurred

[37]This was the first of three inspections; the others occurred on September 27, 2004, and May 11, 2005.

[38]Chadwick admitted that he had no records indicating that spore testing had occurred in the following time periods: October 5-25, 2004; November 30 through December 14, 2004; December 14-27, 2004; December 27, 2004, through January 10, 2005, and February 1-28, 2005. Chadwick testified that the office was closed for vacation between October 5 and 25, 2004, and claimed that spore testing occurred in February, 2005, but did not address any of the other gaps in the records.

[39]Dr. John D. Da Silva also testified that the records Chadwick kept were in compliance. Chadwick testified at the hearing that, before July, 2004, he

with Eklund's testimony, CDC guidelines and a previous board decision[40] that spore testing "must be conducted at a minimum on a weekly basis and records must be maintained that reflect the outcome and dates of spore testing." It disagreed with Dr. Da Silva's testimony and discredited that of Chadwick because he was "admittedly unaware of CDC guidelines and OSHA standards" and "demonstrated a laxity related to infection control that makes it highly unlikely that [he] conducted spore testing." It also discredited the testimony of Summerton and Jolie because neither were consistently present during the first inspection, and thus unqualified to refute Perault's testimony that Chadwick told her he did not conduct spore testing, and because "as employees of [Chadwick], [both] have some incentive to testify in a manner favorable to [him]." As a result, the board faulted Chadwick for not conducting spore testing or maintaining records of the testing results before March, 2005.

Substantial evidence supports the board's findings. This is evident from Chadwick's own admissions regarding his practice before the July, 2004, inspection and the physical records, or lack thereof, available after the July, 2004, inspection.[41] It is also

would mark the results of a successful spore test on a piece of masking tape affixed to the vial and store those vials in a box. He could not recall, however, whether those vials were in his office during the first inspection and admitted that he did not keep "exact weekly records." There is no indication that the board considered this evidence in determining that Chadwick did not conduct or record spore testing. The board, however, acted within its discretion in not explicitly considering this evidence, given Chadwick's inability to recall whether the vials were present in his office and his admission that he did not keep weekly records.

[40]Chadwick argues that the board impermissibly relied on a previous decision, Abrahamson, supra, in assessing his spore testing practices. Because Abrahamson was not issued until after his hearing had concluded, Chadwick specifically argues that he was not put on proper notice of the requirements contained therein.

Chadwick's arguments on this point are unpersuasive. A fair reading of the board's decision indicates that Abrahamson was not essential to its reasoning. The board had reviewed Eklund's testimony and the CDC guidelines alongside Abrahamson and concurred with the finding in each that "spore testing must be conducted at a minimum on a weekly basis and records must be maintained that reflect the outcome and dates of spore testing." We agree with the board that it then cited to Abrahamson "merely to reflect that it previously had found a violation of infection control standards to constitute misconduct."

[41]Though the board noted that those records were not in the administrative

evident from the testimony presented at the hearing, although Chadwick contends that the board improperly assessed the credibility of his witnesses.

The "task of assessing the credibility of witnesses is one uniquely within [the board's] discretion," and we will only "modify or set aside findings and conclusions that are arbitrary or unsupported by substantial evidence" (citations omitted). *Bettencourt* v. *Board of Registration in Med.*, 408 Mass. 221, 227 (1990). Based on this standard of review, we see no cause to disrupt the board's credibility determinations regarding the expert or lay witnesses.

It is well within the board's discretion to choose between conflicting experts. See *D'Amour* v. *Board of Registration in Dentistry*, *supra* at 583. Given the fact that Eklund's testimony was more comprehensive than Dr. Da Silva's and corresponded with the board's own reading of the CDC guidelines, both in Chadwick's and a previous case, the board's crediting Eklund over Dr. Da Silva was a reasonable exertion of that discretion. Similarly, although we may have weighed the significance of Chadwick's knowledge of infection control protocol or the allegiance of his employees differently, we cannot say that the board acted arbitrarily or without substantial evidence. The administrative hearings counsel saw and heard the witnesses testify, and a reasonable mind could view the evidence as she and the board did. Therefore, we uphold the board's credibility determinations with respect to Chadwick, Summerton, and Jolie and affirm its finding that Chadwick failed to conduct weekly spore testing or record the results of that testing.

4. *Conclusion.* The matter is remanded to the single justice who is directed to remand the case to the board for further proceedings consistent with this opinion.

*So ordered.*

---

record for their review, there was ample testimony acknowledging the gaps in Chadwick's record-keeping.